IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

**FILED**

**February 27, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 14-0103

PATRICIA S. REED, COMMISSIONER,
WEST VIRGINIA DIVISION OF MOTOR VEHICLES
Petitioner Below, Petitioner

v.

JEFFREY HILL,
Respondent Below, Respondent

Appeal from the Circuit Court of Kanawha County
Honorable Carrie L. Webster, Judge
Civil Action No. 12-AA-140

REVERSED AND REMANDED

Submitted: January 27, 2015
Filed: February 27, 2015

Patrick Morrisey, Esq.                          Todd F. La Neve, Esq.
Attorney General                                Clarksburg, West Virginia
Janet E. James, Esq.                            Attorney for Respondent
Senior Assistant Attorney General
Charleston, West Virginia
Attorneys for Petitioner

JUSTICE LOUGHRY delivered the Opinion of the Court.
JUSTICE DAVIS dissents and reserves the right to file a dissenting opinion.

**SYLLABUS BY THE COURT**

1. "On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W.Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. Pt. 1, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996).

2. "Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: '(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.'" Syl. Pt. 2, *Shepherdstown Volunteer Fire Dept. v. State ex rel. State of W.Va. Human Rights Comm'n*, 172 W.Va. 627, 309 S.E.2d 342 (1983).

3.     "A driver's license to operate a motor vehicle in this State cannot be administratively revoked solely and exclusively on the results of the driver's horizontal gaze nystagmus test.  Rather, additional evidence in conjunction with the horizontal gaze nystagmus test is required for revocation:  for example, the results of other field sobriety tests; the results of a secondary chemical test; whether the vehicle was weaving on the highway; whether the driver admitted consuming an alcoholic beverage; whether the driver exhibited glassy eyes or slurred speech; and/or whether the odor of an alcoholic beverage was detected."  Syl. Pt. 3, *White v. Miller*, 228 W.Va. 797, 724 S.E.2d 768 (2012).

4.     """"Probable cause to make an arrest without a warrant exists when the facts and circumstances within the knowledge of the arresting officers are sufficient to warrant a prudent man in believing that an offense has been committed.'  Point 1 Syllabus, *State v. Plantz*, [155] W.Va. [24] [180 S.E.2d 614]."  Syllabus Point 3, *State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973).'  Syl. Pt. 7, *State v. Craft*, 165 W.Va. 741, 272 S.E.2d 46 (1980)."  Syl. Pt. 2, *State v. Rahman*, 199 W.Va. 144, 483 S.E.2d 273 (1996).

5.     "Where there is evidence reflecting that a driver was operating a motor vehicle upon a public street or highway, exhibited symptoms of intoxication, and had consumed alcoholic beverages, this is sufficient proof under a preponderance of the evidence

ii

standard to warrant the administrative revocation of his driver's license for driving under the influence of alcohol." Syl. Pt. 2, *Albrecht v. State*, 173 W.Va. 268, 314 S.E.2d 859 (1984).

6.      The requirement in West Virginia C.S.R. § 64-10-7.2(a) (2005) that a law enforcement officer shall keep the person being tested under constant observation for a period of twenty minutes before administering a secondary chemical breath test does not require uninterrupted visual monitoring. The observation may be accomplished by the officer's use of his or her visual, auditory, and olfactory senses.

LOUGHRY, Justice

The petitioner, Patricia S. Reed, Commissioner of the West Virginia Division of Motor Vehicles ("Commissioner"),[1] appeals the Circuit Court of Kanawha County's December 30, 2013, order affirming the November 13, 2012, order of the Office of Administrative Hearings ("OAH"). The OAH reversed the Commissioner's January 28, 2011, order that administratively revoked the respondent Jeffrey Hill's driver's license for driving a motor vehicle while under the influence of alcohol ("DUI"). The OAH found there was insufficient evidence that the respondent was DUI or was lawfully arrested for DUI. After carefully considering the parties' briefs and oral argument, as well as the appendix record on appeal and the applicable law, we reverse the circuit court's order for the reasons set forth below and remand this matter for reinstatement of the Commissioner's revocation order.

## I. Factual and Procedural Background

Deputy Edwin Delgado of the Taylor County Sheriff's Department testified that on the early morning of October 24, 2010, his police cruiser was nearly hit head-on by an oncoming vehicle, requiring the deputy to take quick evasive action to avoid a collision.

---

[1]When the revocation order was entered, Joe Miller was the Commissioner of the West Virginia Division of Motor Vehicles. Pursuant to Rule 41(c) of the Rules of Appellate Procedure, the current commissioner, Patricia S. Reed, has been automatically substituted as the named petitioner herein.

1

He indicated that the driver of the other vehicle took no action to avoid a collision and, in the deputy's estimation, was traveling in excess of the posted speed limit. The deputy turned his cruiser around, caught up with the other vehicle, and initiated a traffic stop at 2:07 a.m.

The stopped vehicle was driven by the respondent, Jeffrey Hill, and contained two passengers. At the administrative hearing in this matter, Mr. Hill denied speeding and denied that he was driving down the very center of the roadway; however, he admitted that he was driving toward the center of the unlined roadway and that he also had to swerve to avoid striking the police car. He testified that immediately after swerving, he knew he was going to be pulled over. Mr. Hill has conceded that the officer had sufficient grounds to stop his vehicle.[2]

Upon having Mr. Hill exit the vehicle, Deputy Delgado smelled an odor of an alcoholic beverage emanating from both the vehicle and from Mr. Hill's breath. The deputy observed that Mr. Hill had bloodshot and glassy eyes, was a bit unsteady while standing, talked in a continuous and excited manner, and had a slight slur in his speech. The deputy attributed the slur to both nervousness and to alcohol impairment. Mr. Hill admitted that he had been drinking beer, but he chose to drive his friend's car because he believed that he was

---

[2]Deputy Delgado testified that in the related criminal case, Mr. Hill "pled to reckless driving" and a DUI charge was dismissed. The record before us does not indicate whether the reckless driving plea was guilty or no contest.

2

in a better condition to drive than were his friends. The deputy administered three field sobriety tests–the horizontal gaze nystagmus ("HGN"), the walk and turn, and the one leg stand–and a preliminary breath test ("PBT") to Mr. Hill.[3] Mr. Hill passed the walk and turn and one leg stand tests. As to the HGN test, the deputy wrote on the DUI Information Sheet that he observed two detection clues in each of Mr. Hill's eyes. Two detection clues in each eye constitutes a total of four detection clues, which is a failing score. However, at the administrative hearing, the deputy gave contradictory testimony about his observations during the HGN test and testified to his belief that Mr. Hill had passed the test.

Mr. Hill took the PBT at 2:15 a.m. The PBT registered a blood alcohol concentration ("BAC") of .114. Deputy Delgado arrested Mr. Hill for DUI at 2:25 a.m. and subsequently transported him to the police station.[4] *See* W.Va. Code § 17C-5-2(2010) (defining criminal DUI to include driving under the influence of alcohol or driving with a BAC of .08 or more). Mr. Hill executed the West Virginia Implied Consent Statement and, at 4:11 a.m., registered a BAC of .108 on the designated secondary chemical breath test.

---

[3]Mr. Hill testified that the field sobriety tests were only administered after he was transported to the police station. However, Deputy Delgado testified that he administered the field sobriety tests at both the scene of the traffic stop and again at the station, with the same results.

[4]There was a short delay in transporting Mr. Hill while Deputy Delgado ensured that Mr. Hill's passengers, who had also been drinking, were picked up by their parents.

3

Deputy Delgado wrote on the DUI Information Sheet that during a post-arrest interview, Mr. Hill admitted that he had consumed four twelve-ounce bottles of light beer in a period of one hour.[5]  However, during the administrative hearing, Mr. Hill testified that he had consumed this amount of beer over a longer period of time.  Mr. Hill also testified that he had stopped drinking one hour before driving because he wanted to "sober up," but he then denied that he was under the influence of alcohol.[6]  Finally, Mr. Hill's father testified that when he saw the respondent approximately one hour after the arrest, his son did not appear to be impaired.[7]

Upon receipt of the DUI Information Sheet completed by Deputy Delgado, the Commissioner entered an order on January 28, 2011, administratively revoking Mr. Hill's driver's license for DUI.  *See* W.Va. Code § 17C-5A-1 (2008) (providing for revocation of

[5]The deputy explained that during a post-arrest interview, he reads each question on the DUI Information Sheet and then records verbatim the person's answers. The deputy wrote that Mr. Hill said, "I found myself in a situation where I thought I was better off to drive but that was found to be nontrue [sic].  I only had four beers in an hour and figured I would be sober enough to drive.  I regret risking everyones [sic] life [sic]!"

[6]At the hearing, when asked when he had finished his last beer, Mr. Hill testified that "[i]t was about an hour before I got in the car.  I decided to, you know, try to sober up or whatever you want to say about it.  I mean, I stopped drinking because I realized I had to drive because I was better off than either of the two people I was with."  Mr. Hill went on to deny that he was ever impaired that night, even at the point in time when he had decided to stop drinking.

[7]A passenger in the vehicle also testified, but he was too intoxicated at the time of the arrest to know whether Mr. Hill was under the influence of alcohol.

4

driver's license if person drives under the influence of alcohol or drives with a BAC of .08 or more).[8]

Mr. Hill timely challenged the revocation at the OAH. After holding an evidentiary hearing, the OAH reversed the Commissioner's revocation order. The OAH concluded that the deputy had sufficient reasonable suspicion to initiate the traffic stop, but did not have reasonable grounds to believe that Mr. Hill was driving under the influence of alcohol or to make a lawful arrest. *See* W.Va. Code § 17C-5A-2(f) (2010). In reaching these conclusions, the OAH found that the HGN test was improperly administered and must be disregarded; that Mr. Hill passed two field sobriety tests despite continuously talking to the officer, and his talking would have been distracting to Mr. Hill thus making it harder to pass those tests; and that the PBT result must be disregarded because Deputy Delgado was not properly certified to administer the PBT and had failed to observe Mr. Hill for fifteen minutes before administering the test. The OAH's order did not mention the secondary chemical test result.

---

[8]Because the secondary chemical test showed that Mr. Hill had a BAC of higher than .08, his driver's license was revoked for at least ninety days or until he complied with provisions of the Test and Lock Program. However, we note that even if Mr. Hill's BAC had been at a lower level of between .02 and .08, a sixty-day suspension of his license would still be required because he was eighteen years old. *See* W.Va. Code § 17C-5A-1(c) (2008); W.Va. Code § 17C-5A-2(n) (2010).

The Commissioner appealed to the circuit court, which affirmed the OAH on December 30, 2013. In addition to discounting the evidence of the HGN and PBT tests, the circuit court concluded that the results of the secondary chemical test should be disregarded because, in the circuit court's opinion, Deputy Delgado did not constantly observe Mr. Hill for the required twenty minutes prior to the administration of the secondary test.

Seeking reinstatement of the revocation order, the Commissioner now appeals the circuit court's order to this Court.

## II. Standard of Review

This Court applies the following standard of review when reviewing a circuit court's order in an administrative appeal:

> On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W.Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.

Syl. Pt. 1, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996).

> Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision

6

of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: "(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

Syl. Pt. 2, *Shepherdstown Volunteer Fire Dept. v. State ex rel. State of W.Va. Human Rights Comm'n*, 172 W.Va. 627, 309 S.E.2d 342 (1983). With these precepts in mind, we turn to a consideration of the case before us.

## III. Discussion

West Virginia Code § 17C-5A-2(f) requires the OAH to make specific findings after considering the evidence in an administrative hearing. These findings include whether the investigating law enforcement officer had reasonable grounds to believe the person was driving under the influence of alcohol, whether the person was lawfully placed under arrest, and whether the tests, if any, were administered in accordance with the law.[9] When

---

[9]The 2010 version of West Virginia Code § 17C-5A-2(f) applies to this case. This statute provided as follows:

In the case of a hearing in which a person is accused of driving a motor vehicle while under the influence of alcohol, controlled substances or drugs, or accused of driving a motor vehicle while having an alcohol concentration in the person's blood of eight hundredths of one percent or more, by weight, or

7

overturning the Commissioner's revocation order, the OAH concluded that Deputy Delgado

did not have sufficient evidence of DUI to arrest Mr. Hill during the traffic stop. For the

reasons discussed below, this was error. While the OAH was not clearly wrong to disregard

the results of the HGN and PBT tests, there still remained evidence of DUI providing the

deputy with probable cause to arrest Mr. Hill. Moreover, when considering all of the

accused of driving a motor vehicle while under the age of twenty-one years with an alcohol concentration in his or her blood of two hundredths of one percent or more, by weight, but less than eight hundredths of one percent, by weight, the Office of Administrative Hearings shall make specific findings as to: (1) Whether the investigating law-enforcement officer had reasonable grounds to believe the person to have been driving while under the influence of alcohol, controlled substances or drugs, or while having an alcohol concentration in the person's blood of eight hundredths of one percent or more, by weight, or to have been driving a motor vehicle while under the age of twenty-one years with an alcohol concentration in his or her blood of two hundredths of one percent or more, by weight, but less than eight hundredths of one percent, by weight; (2) whether the person was lawfully placed under arrest for an offense involving driving under the influence of alcohol, controlled substances or drugs, or was lawfully taken into custody for the purpose of administering a secondary test: *Provided*, That this element shall be waived in cases where no arrest occurred due to driver incapacitation; (3) whether the person committed an offense involving driving under the influence of alcohol, controlled substances or drugs, or was lawfully taken into custody for the purpose of administering a secondary test; and (4) whether the tests, if any, were administered in accordance with the provisions of this article and article five of this chapter.

8

evidence of DUI, including the .108 BAC result on the secondary chemical breath test, the

Commissioner's revocation order should have been upheld.

### A. PBT and HGN Test Results

The OAH found that Deputy Delgado did not properly administer the HGN test

because he failed to perform a pre-assessment to ascertain whether Mr. Hill's eyes displayed

equal tracking. The OAH also found that the deputy gave conflicting evidence regarding his

observations during the HGN test. In prior cases, we have explained that a police officer's

failure to satisfy some requirements for administering an HGN test goes to the weight of the

evidence, not to its admissibility. *Dale v. Oakland*, 234 W.Va. 106, ___, 763 S.E.2d 434,

440 (2014); *Dale v. McCormick*, 231 W.Va. 628, 633-34, 749 S.E.2d 227, 232-33 (2013).

After examining the record in this case, we conclude that the OAH's concerns

about the HGN test were well-founded. The DUI Information Sheet indicates that the deputy

engaged in a medical assessment of Mr. Hill, during the course of which the officer observed

that Mr. Hill had equal pupils, no resting nystagmus, and equal tracking. However, during

the administrative hearing the deputy testified that he did not check for equal tracking of the

eyes prior to administering the HGN test. He also did not ask whether Mr. Hill had an injury

or condition that would impact his ability to take the HGN test. With regard to the deputy's

observations during the test, Deputy Delgado recorded on the DUI Information Sheet that

9

Mr. Hill exhibited a lack of smooth pursuit in each eye, exhibited distinct and sustained nystagmus at the maximum deviation in each eye, but did not exhibit the onset of nystagmus prior to forty-five degrees. However, in marked contrast to the DUI Information Sheet data, the deputy testified at the administrative hearing that he did observe the onset of nystagmus prior to forty-five degrees. Moreover, while conceding on direct examination that the boxes he checked on the DUI Information Sheet reflected that Mr. Hill had failed the HGN test, the deputy nonetheless maintained his belief that Mr. Hill had indeed passed. Because the contradictory evidence from Deputy Delgado raised concerns about whether the HGN test was properly administered, it was not clearly wrong for the OAH to accord no weight to the HGN test results.[10]

As to the PBT test result, the OAH disregarded this evidence for two reasons. First, the OAH found that "certified records provided by the West Virginia Division of Motor

---

[10]In its order, the circuit court added an additional reason why the HGN result should be disregarded: the circuit court found that Mr. Hill may have been exposed to the police car's flashing emergency lights during the test. The circuit court discussed that flashing lights can cause optokinetic nystagmus, and this type of nystagmus is not indicative of alcohol consumption. However, not only did the OAH make no findings of fact regarding the police car's flashing lights and optokinetic nystagmus, the circuit court's findings in this regard are wholly unsupported by the record. Mr. Hill never claimed that any lights were in his eyes or affected his ability to take field sobriety tests, and the deputy testified that he made sure there were no lights–including the cruiser's flashing lights–shining in Mr. Hill's eyes during the HGN test. Indeed, Mr. Hill testified that the field sobriety tests were administered at the police station where, presumably, there were no flashing emergency lights.

Vehicles do not establish that the Investigating Officer was trained and certified to administer the SD-5 Preliminary Breath Test." Critically, no such records were included in the administrative record or even identified in the OAH's order. Moreover, when asked about this during the hearing, Deputy Delgado testified that he was certified on the SD-5 on January 25, 2009. Accordingly, we must conclude that the OAH's finding regarding the officer's training and certification was clearly wrong in view of the reliable, probative, and substantial evidence on the whole record.

Second, the OAH found that Deputy Delgado did not observe Mr. Hill for fifteen minutes prior to administering the PBT. The West Virginia Bureau for Public Health has promulgated a legislative rule providing that "[t]he law enforcement officer shall prohibit the person from drinking alcohol or smoking for at least fifteen minutes before conducting the [PBT] test." W.Va. C.S.R. § 64-10-5.2(a) (2005). West Virginia Code § 17C-5-5 (1983) directs that a PBT "must be administered with a device and in a manner approved by the Department of Health for that purpose." Undoubtedly, the purpose of this legislative rule is to promote accuracy and reliability in the test result. According to the DUI Information Sheet, Deputy Delgado administered the PBT just eight minutes after he first had contact with Mr. Hill. Because the deputy did not comply with C.S.R. § 64-10-5.2(a) by prohibiting

11

Mr. Hill from drinking alcohol and smoking for at least fifteen minutes before the PBT was administered, the OAH was not clearly wrong to exclude this test result.[11]

## B. Probable Cause to Arrest for DUI

The analysis required by West Virginia Code § 17C-5A-2(f)(2)[12] as to whether Mr. Hill "was lawfully placed under arrest for an offense involving driving under the influence of alcohol . . . or was lawfully taken into custody for the purpose of administering a secondary test" does not end with the exclusion of Mr. Hill's HGN and PBT test results. Neither the DUI statutes nor our case law require a PBT or any particular field sobriety test to establish that a driver was under the influence for purposes of administrative revocation.[13]

---

[11]When discussing that the PBT result should not be considered, the circuit court required a longer waiting period than did the OAH. The circuit court found that the manufacturer of this particular PBT device requires a twenty-minute waiting period before taking a breath sample, and West Virginia C.S.R. § 64-10-5.1 provides that "[t]he use of the approved [PBT] instrument shall adhere to the manufacturer's specifications for operation[.]" Because the manufacturer's recommendations were never put in the record, it is unclear how the circuit court made the determination that a twenty minute period should be used. Given our conclusion that the shorter fifteen minute period required by C.S.R. § 64-10-5.2(a) was not met, we need not address the circuit court's findings on this issue.

[12]*See supra* note 9.

[13]Our laws also do not require a secondary chemical test to prove that a motorist was DUI for purposes of administrative revocation. Syl. Pt. 5, *Coll v. Cline*, 202 W.Va. 599, 505 S.E.2d 662 (1998); Syl. Pt. 1, *Albrecht v. State*, 173 W.Va. 268, 314 S.E.2d 859 (1984).

Indeed, the Legislature expressly left the decision on whether to administer a PBT to the law enforcement officer's discretion. West Virginia Code § 17C-5-5 provides that when an officer has reason to believe that a person has committed a DUI offense, the "officer *may* require such person to submit to a preliminary breath analysis for the purpose of determining such person's blood alcohol content." *Id.* (emphasis added); *accord* W.Va. Code § 17C-5-4(b) (2010) (also stating PBT "may" be administered). Moreover, the OAH is only required to determine whether tests were correctly administered if any tests were, in fact, given. W.Va. Code § 17C-5A-2(f)(4) (directing OAH to make findings on whether "tests, if any," were administered in accordance with law).

The PBT and field sobriety tests, if administered, are tools for the officer to use,[14] but the results of those tests do not constitute the totality of the evidence that a law enforcement officer may consider when deciding whether to arrest a driver for DUI. In *White v. Miller*, a case addressing how HGN test results may be used in a license revocation proceeding, we listed several examples of evidence indicative of DUI:

---

[14]The Legislature has directed that a PBT is "solely for the purpose of guiding the officer in deciding whether an arrest should be made." W.Va. Code § 17C-5-5. An HGN test may be used to guide the officer in deciding whether an arrest should be made, and it is also substantive evidence of impairment. *See* Syl. Pt. 1, in part, *White v. Miller*, 228 W.Va. 797, 724 S.E.2d 768 (2012) ("The horizontal gaze nystagmus test is a field sobriety test, and a driver's performance on the test is admissible as evidence that the driver may have consumed alcohol and may, therefore, be impaired.").

A driver's license to operate a motor vehicle in this State cannot be administratively revoked solely and exclusively on the results of the driver's horizontal gaze nystagmus test. Rather, additional evidence in conjunction with the horizontal gaze nystagmus test is required for revocation: for example, the results of other field sobriety tests; the results of a secondary chemical test; whether the vehicle was weaving on the highway; whether the driver admitted consuming an alcoholic beverage; whether the driver exhibited glassy eyes or slurred speech; and/or whether the odor of an alcoholic beverage was detected.

Syl. Pt. 3, *White v. Miller*, 228 W.Va. 797, 724 S.E.2d 768 (2012). Thus, it is clear that neither the relevant statutes nor our case law require that a preliminary breath test or any particular field sobriety test be administered, and failed, in order to establish that a motorist was driving under the influence. The results of such tests, if the tests were properly administered, are to be considered in conjunction with all of the other evidence.

In 2010, the Legislature reinserted language into West Virginia Code § 17C-5A-2(f) requiring the OAH to make a finding that the arrest for DUI was lawful. *Dale v. Ciccone*, 233 W.Va. 652, 658-59, 760 S.E.2d 466, 472-73 (2014). To be lawful, an arrest must be supported by probable cause. *Ciccone*, 233 W.Va. at 661, 760 S.E.2d at 475; *State v. Runner,* 172 W.Va. 720, 723, 310 S.E.2d 481, 484 (1983) (Reiterating that "a warrantless arrest . . . must be supported by probable cause to be valid"). On multiple occasions, this Court has explained that

""""[p]robable cause to make an arrest without a warrant exists when the facts and circumstances within the knowledge of the arresting officers are sufficient to warrant a prudent man in believing that an offense has been

14

committed." Point 1 Syllabus, *State v. Plantz*, [155] W.Va. [24] [180 S.E.2d 614].' Syllabus Point 3, *State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973)." Syl. Pt. 7, *State v. Craft*, 165 W.Va. 741, 272 S.E.2d 46 (1980).

Syl. Pt. 2, *State v. Rahman*, 199 W.Va. 144, 483 S.E.2d 273 (1996); *accord* Syl. Pt. 1, *State v. Drake*, 170 W.Va. 169, 291 S.E.2d 484 (1982). The United States Supreme Court has phrased the test as follows:

> This Court repeatedly has explained that "probable cause" to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

*Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) (citations omitted).

It is important to remember that a law enforcement officer may have evidence sufficient to establish probable cause for an arrest, even if that evidence is less than what would be needed to ultimately convict at a criminal trial. "It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion . . . though the arresting officer need not have in hand evidence which would suffice to convict." *Wong Sun v. United States*, 371 U.S. 471, 479 (1963) (internal citation omitted). The United States Supreme Court has "made clear that the kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest." *DeFillippo*, 443 U.S. at 36 (citations omitted). "[I]t is clear that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Illinois v. Gates*, 462

15

U.S. 213, 235 (1983) (citation and internal quotation marks omitted); *accord Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

Indeed, "the probable-cause standard does not require that the officer's belief be more likely true than false." *United States v. Humphries*,  372 F.3d 653, 660 (4th Cir. 2004) (citation omitted) (reversing district court's misapprehension that probable cause meant "more likely than not, [more than] 50/50"). "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Pringle,* 540 U.S. at 371 (citations omitted). Probable cause is a "practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.,* 540 U.S. at 370 (citations and internal question marks omitted).

Returning to the case before us, we find that there was probable cause for Deputy Delgado to arrest Mr. Hill for DUI.[15]  A prudent person would believe, under the circumstances presented here, that a DUI offense was committed.  The evidence that Mr. Hill passed the walk and turn and one leg stand field sobriety tests, even while constantly talking,

---

[15]The OAH found, and Mr. Hill concedes, that Officer Delgado had reasonable suspicion to initiate the traffic stop.  The disputed issue in this case is whether, after the traffic stop, there was probable cause for the arrest.

is evidence in his favor.[16]  Contrasted with those assessments, however, is the evidence of

Mr. Hill's driving.  The deputy testified that Mr. Hill almost caused a head-on collision

requiring the officer to take quick evasive action.  Even though Mr. Hill's lawyer tried to

challenge the deputy's description of the avoided collision, during his own testimony Mr.

Hill conceded that he had been driving more toward the center of the roadway, that he had

to swerve to avoid hitting the police car, and that he immediately knew the officer was going

to pull him over because of his driving.  This evidence of erratic driving does not go just to

the issue of whether the traffic stop was justified; it is also evidence that Mr. Hill was driving

while under the influence.  Moreover, Mr. Hill had the odor of alcohol on his breath, had

bloodshot and glassy eyes, exhibited some unsteadiness while standing, had a slight slur

when speaking, and talked in a continuous and excited manner.  He admitted to the deputy

that he drank beer before he drove the car, but he believed he was in a better condition to

drive than were his friends.  This was sufficient to establish probable cause to arrest Mr. Hill

for DUI.  When finding otherwise, the OAH and the circuit court imposed a level of proof

that exceeds what is required to establish probable cause.

---

[16]Because the HGN and PBT results were disregarded due to concerns about the officer's administration of those tests, the HGN and PBT neither favor nor disfavor a finding of DUI.

## C. Secondary Chemical Breath Test and Revocation

After concluding that there was probable cause to arrest, we turn to the issue of whether the license revocation was proper. "The principal question at the [administrative license revocation] hearing shall be whether the person did drive a motor vehicle while under the influence of alcohol . . . or did drive a motor vehicle while having an alcohol concentration in the person's blood of eight hundredths of one percent or more, by weight[.]" W.Va. Code § 17C-5A-2(e). We have held that

> [w]here there is evidence reflecting that a driver was operating a motor vehicle upon a public street or highway, exhibited symptoms of intoxication, and had consumed alcoholic beverages, this is sufficient proof under a preponderance of the evidence standard to warrant the administrative revocation of his driver's license for driving under the influence of alcohol.

Syl. Pt. 2, *Albrecht v. State*, 173 W.Va. 268, 314 S.E.2d 859 (1984).

In addition to the evidence that provided probable cause to arrest Mr. Hill for DUI, Mr. Hill registered a .108 BAC on the secondary chemical breath test. Pursuant to West Virginia Code § 17C-5-8(a)(3) (2004), a chemical test result of .08 or more within two hours of arrest is prima facie evidence that the person was under the influence of alcohol.[17]

---

[17]The 2004 version of West Virginia Code § 17C-5-8 applies to this case. When the statute was amended in 2013, this presumption was redesignated as § 17C-5-8(b)(3).

18

The OAH's order did not mention Mr. Hill's secondary chemical breath test, undoubtedly because the OAH found that the arrest was unlawful and the secondary test was administered after the arrest. *See* W.Va. Code § 17C-5-4(c) (2010) (stating that secondary test of breath is incidental to lawful arrest). Despite the OAH's silence on the issue, the circuit court considered the secondary chemical breath test and concluded that the result should be excluded from evidence. However, the circuit court's conclusions regarding the secondary test were based upon the court's mistaken interpretation of a legislative rule. As set forth above, we apply a de novo standard of review to questions of law. *Muscatell*, 196 W.Va. at 590, 474 S.E.2d at 520, syl. pt. 1.

To be admissible into evidence and give rise to a presumption of DUI, a secondary chemical test must be performed in accordance with methods and standards approved by the Bureau for Public Health. W.Va. Code § 17C-5-8(c) (2004); Syl. Pt. 4, *State v. Dyer*, 160 W.Va. 166, 233 S.E.2d 309 (1977).[18] To that end, the Bureau promulgated a legislative rule requiring a twenty-minute observation period prior to the administration of a secondary breath test:

---

[18]The 2004 version of this statute was in effect at the time of Mr. Hill's arrest. When the statute was later amended, the requirement for performing a secondary chemical test in accordance with approved methods and standards was redesignated as West Virginia Code § 17C-5-8(e)(1) (2013). When *State v. Dyer* was decided, this requirement was codified in West Virginia Code § 17C-5A-5.

19

> The law enforcement officer shall keep the person being tested under constant observation for a period of twenty minutes before the [secondary breath] test is administered to insure that the person has nothing in his or her mouth at the time of the test and that he or she has had no food or drink or foreign matter in his or her mouth during the observation period.

W.Va. C.S.R. § 64-10-7.2(a) (2005). When discussing the requirements of this rule, the circuit court made two errors.

First, the circuit court found that "[t]he most reliable evidence of the start of the observation period is generally the time of execution of the West Virginia Implied Consent warning." The circuit court went on to note that Mr. Hill executed the implied consent form at 3:54 a.m., while the printer ticket from the secondary breath test device indicated that Mr. Hill's breath sample was obtained at 4:11 a.m., a total of seventeen minutes later. The circuit court found that this "clearly indicates the arresting officer did not observe Hill for the full twenty minutes required under the aforementioned rule."

The circuit court's rationale is simply not supported by the plain language of C.S.R. § 64-10-7.2(a). Beginning the observation period from the time when the implied consent form is signed would be a convenient way to ensure that the twenty-minute period is observed. However, the rule does not mandate that obtaining a signature on a form be the starting point for the observation. The rule only requires that the twenty-minute observation period occur before the administration of the test. In the case *sub judice*, so long as Deputy

Delgado constantly observed that Mr. Hill had no food, drink, or foreign matter in his mouth in the twenty minutes immediately preceding the administration of the secondary breath test–which would include the three minutes before the implied consent form was signed–then the deputy fully complied with the pre-test observation requirement.

The evidence in the record shows that Deputy Delgado did have Mr. Hill under constant observation for twenty minutes prior to administering the secondary breath test. Deputy Delgado affirmatively testified that he ensured that Mr. Hill had nothing in his mouth for a period "well longer" than twenty minutes prior to the test, and that Mr. Hill was in his presence and view for the entire twenty-minute period. The officer added that the only time Mr. Hill was allowed to leave his sight was after the test was completed, when Mr. Hill was allowed to use the restroom. This evidence was unrefuted at the hearing.[19]

Second, the circuit court misapplied the requirement in C.S.R. § 64-10-7.2(a) that the observation be "constant." The circuit court found that Deputy Delgado's observation was not "constant" because the deputy readied and entered data into the secondary breath testing device during the twenty-minute observation period. The circuit court based this finding upon the device's printer ticket that showed a test sequence occurring

---

[19]Mr. Hill did not testify about the length of time that he was observed prior to taking the secondary chemical test. As to whether he had anything in his mouth, Mr. Hill testified only that he spit out some chewing gum before taking the PBT during the traffic stop.

at 4:08 a.m., which was three minutes before Mr. Hill blew into the machine. Even though it was uncontested that Mr. Hill was in the deputy's presence the entire time, the circuit court found that it would be "impossible" for the deputy to have "constantly" observed Mr. Hill while performing tasks on the machine.

With this ruling, the circuit court has interpreted the legislative rule to require that a law enforcement officer may never divert his or her eyes from the person to be tested, even when the person is in close proximity to the officer. We disagree. The regulation does not limit the period of constant observation to "constant visual observation," and a law enforcement officer can ensure that a person has nothing in his or her mouth without fixedly staring at the person for the entire twenty-minute period. In addition to visually observing, an officer who is in close proximity may rely on his other senses, including hearing and smell, to maintain a constant observation of the test subject.

Other jurisdictions with regulations similar to our rule are in agreement. For example, in *State v. Smith*, 547 A.2d 69 (Conn. App. Ct. 1988), the Connecticut Appellate Court considered a regulation requiring a DUI suspect to be under "continuous observation" for fifteen minutes prior to the administration of the breath test. The court held that this regulation must be interpreted with reference to its stated purpose of ensuring that the person being tested had not ingested food or beverages, regurgitated, or smoked. *Id.*, 547 A.2d at

22

The court determined that an officer could ensure that those activities did not occur without "fix[ing] his unswerving gaze upon a subject" during the observation period, and a contrary interpretation "would not only be practically impossible to perform but would allow a subject to thwart compliance with the regulation simply by turning his head away from the observing officer." *Id.*

In *State v. Remsburg*, 882 P.2d 993 (Idaho Ct. App. 1994), the Idaho Court of Appeals considered a criminal DUI defendant's claim that she was not "closely observed" during the secondary breath test's observation period because the officer's attention was briefly diverted while programming the testing machine, waiting for the machine to warm up, and reading the advisory form to the suspect. As a matter of law, the court rejected the argument that continuous, direct, visual observation was required for the entire observation period. *Id.,* 882 P.2d at 995-996.

Likewise, the Illinois Court of Appeals ruled that a DUI suspect was under the required period of "continuous observation" even though, during the six minutes immediately preceding the administration of the secondary breath test, the officer focused his attention on resetting the testing machine. *In re Ramos*, 508 N.E.2d 484, 485-86 (Ill. App. Ct. 1987). The evidence showed that the officer never left the suspect, who was within the officer's peripheral vision; that there was no water fountain or food in the area; and that the officer

23

did not smell smoke or see vomit. *Id.* The court affirmed the revocation of the driver's license.[20]

We do not overlook the possibility that the period of constant observation, once begun, could be disrupted by the acts or omissions of a law enforcement officer. As another court sagely noted, "[a]n officer's observation should be of the sort capable of detecting contamination if it actually occurred. Thus, an officer who looks away must be close enough to detect contamination through aural or olfactory senses." *State v. Filson*, 976 A.2d 460, 469 (N.J. Super. 2009).

Accordingly, we now hold that the requirement in West Virginia C.S.R. § 64-10-7.2(a) (2005) that a law enforcement officer shall keep the person being tested under constant observation for a period of twenty minutes before administering a secondary

---

[20]*See also Glasmann v. State, Dept. of Revenue*, 719 P.2d 1096, 1097 (Colo. App. 1986) (finding that regulation requiring "close and continuous observation" does not require officer to stare fixedly at test subject, rather, compliance is question of fact); *Webb-Buckingham v. Delaware*, No. 0612020853 PLA., 2009 WL 147020 (Del. Super. Ct. 2009) (finding DUI suspect was under "continuous" and "uninterrupted" observation while officer completed paperwork nearby); *People v. Chairavalle*, No. 4-14-0445, 2014 WL 7215765 (Ill. App. Ct. Dec. 19, 2014) (finding that observation may be accomplished by using senses in addition to sight); *State v. Scheffert*, 778 N.W.2d 733, 741 (Neb. 2010) (finding that observation does not require officer to stare fixedly at person being tested)*; State v. Filson*, 976 A.2d 460 (N.J. Super. 2009) (recognizing that purpose of observation period may be satisfied through officer's visual, aural, or olfactory senses); *Peterson v. Wyoming Dept. of Transp.*, 158 P.3d 706 (Wyo. 2007) (finding DUI suspect was under observation while officer readied Intoximeter machine).

chemical breath test does not require uninterrupted visual monitoring. The observation may be accomplished by the officer's use of his or her visual, auditory, and olfactory senses. The manner in which the officer conducts the observation period must serve the purpose of ensuring that the person being tested has nothing in his or her mouth at the time of the test and has had no food, drink, or foreign matter in his or her mouth during the observation period. If the officer diverts his eyes from the person being observed, the officer must be in close enough proximity to be able to constantly detect with his other senses whether the person has food, drink, or foreign matter in his or her mouth.[21]

In this case, Deputy Delgado testified that Mr. Hill was in his presence and view during the entire twenty-minute observation period, and that he ensured Mr. Hill had nothing in his mouth during that period. There is no evidence in the record to contradict this testimony or otherwise indicate that the secondary breath test result was compromised. For example, there was no evidence that the deputy left the immediate area where Mr. Hill was being held, no evidence that the deputy was distracted by other people, and no evidence of food or drink that Mr. Hill could have covertly ingested when the deputy's eyes were

---

[21]If the law enforcement officer is unable to personally maintain the entire twenty-minute period of constant observation, another officer may provide assistance. In *McCormick*, 231 W.Va. at 634, 749 S.E.2d at 233, we ruled that the twenty-minute observation period was satisfied when the arresting state trooper left the room but another trooper remained to observe the suspect. "The regulation does not require the observation period be made by the person who administers the Intoximeter test." *Id.*

25

momentarily diverted. There is nothing in the record to indicate that performing tasks at the testing device interrupted Deputy Delgado's ability to constantly observe Mr. Hill. Consequently, we find that the circuit court erred when excluding from evidence Mr. Hill's secondary chemical breath test result.

The preponderance of the evidence in this case, including the events leading up to the arrest and the result of the secondary chemical breath test, prove that Mr. Hill was DUI on October 24, 2010. Accordingly, we conclude that the circuit court erred in affirming the OAH's order that overturned the Commissioner's revocation order.

## IV. Conclusion

For the reasons set forth herein, we reverse the circuit court's December 30, 2013, order. This case is remanded to the circuit court for reinstatement of the Commissioner's order administratively revoking Mr. Hill's driver's license.

Reversed and Remanded with Directions.