IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

FILED

May 22, 2015

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 14-0342

PATRICIA S. REED, COMMISSIONER OF
THE WEST VIRGINIA DIVISION OF MOTOR VEHICLES,
Petitioner Below, Petitioner

v.

DUSTIN HALL,
Respondent Below, Respondent

Appeal from the Circuit Court of Kanawha County
The Honorable James C. Stucky, Judge
Civil Action No. 13-AA-105

AFFIRMED, IN PART, REVERSED, IN PART, AND REMANDED

Submitted: April 7, 2015
Filed:   May 22, 2015

Janet E. James, Esq.
Senior Assistant Attorney General
Charleston, West Virginia
Counsel for Petitioner

William C. Forbes, Esq.
W. Jesse Forbes, Esq.
Forbes Law Offices, PLLC
Charleston, West Virginia
Counsel for Respondent

CHIEF JUSTICE WORKMAN delivered the Opinion of the Court.
JUSTICE LOUGHRY concurs and reserves the right to file a concurring opinion.

SYLLABUS BY THE COURT

1. "On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. Pt. 1, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996).

2. "In cases where the circuit court has [reversed] the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." Syl. Pt. 2, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996).

3. "A person's driver's license may be suspended under W. Va. Code, 17C-5-7(a) [1983] for refusal to take a designated breathalyzer test." Syl. Pt. 2, *Moczek v. Bechtold*, 178 W. Va. 553, 363 S.E.2d 238 (1987).

4. The language of West Virginia Code § 17C-5-4(c) (2010), requiring a secondary blood or breath test to be administered "at the direction of the arresting law-

enforcement officer," does not preclude the arresting officer from directing or authorizing another qualified law enforcement officer to explain implied consent and administer a chemical test for intoxication.

5. "A person who is arrested for driving under the influence who requests and is entitled to a blood test, pursuant to W. Va. Code, 17C-5-9 [1983], must be given the opportunity, with the assistance and if necessary the direction of the arresting law enforcement entity, to have a blood test that insofar as possible meets the evidentiary standards of 17C-5-6 [1981]." Syl. Pt. 2, *In re Burks*, 206 W.Va. 429, 525 S.E.2d 310 (1999).

6. "The requirement that a driver arrested for DUI must be given a blood test on request does not include a requirement that the arresting officer obtain and furnish the results of that requested blood test." Syl. Pt. 3, *In re Burks*, 206 W.Va. 429, 525 S.E.2d 310 (1999).

Workman, Chief Justice:

The West Virginia Division of Motor Vehicles (hereinafter "the DMV")[1] appeals an order of the Circuit Court of Kanawha County affirming an order of the Office of Administrative Hearings (hereinafter "OAH" or "hearing examiner") that reversed a license revocation order entered by the DMV Commissioner based upon the arrest of Dustin Hall for driving under the influence of alcohol (hereinafter "DUI"). Upon thorough review of the record, arguments of counsel, and applicable precedent, this Court reverses the order of the circuit court, in part, and affirms it, in part.

I. Factual and Procedural History

On February 3, 2011, Officer N. W. Harden of the South Charleston Police Department was assisting two other officers of the department with a traffic stop along Montrose Drive in South Charleston, West Virginia. Officer Harden overheard a radio call from the Kanawha County 911 Center regarding a vehicle being driven the wrong way on MacCorkle Avenue approaching Montrose Drive. Officer Harden observed the vehicle traveling south in the northbound lanes of Montrose Drive, and he stopped the vehicle near

---

[1]This appeal was filed by Steven O. Dale when he was the Acting Commissioner of the Division of Motor Vehicles. Pursuant to Rule 41(c) of the Rules of Appellate Procedure, the current Commissioner, Patricia S. Reed, was automatically substituted as the named petitioner.

1

the eastbound ramp to Interstate 64.

According to the testimony of Officer Harden, the driver of the vehicle, Mr. Hall,[2] had difficulty locating his driver's license and appeared disoriented and confused. When asked to walk to the rear of the vehicle, Mr. Hall was unsteady walking to the roadside and while standing. Mr. Hall informed Officer A. J. Davis, also present at the scene, that he had consumed alcoholic beverages with his boss.

Officer Harden explained and administered the horizontal gaze nystagmus test to Mr. Hall. During the administration of that test, Mr. Hall's eyes displayed lack of smooth pursuit and distinct and sustained nystagmus at maximum deviation. He had onset of nystagmus prior to forty-five degrees in both eyes. Officer Harden also explained and demonstrated the walk-and-turn and one leg stand tests, but Mr. Hall refused to perform those tests.

Officer Harden placed Mr. Hall under arrest for DUI at 3:17 a.m. Officer Harden thereafter transferred custody of Mr. Hall to Officer J. D. Keeney, also with the South Charleston Police Department, and Officer Keeney transported Mr. Hall to the police department's headquarters. At the South Charleston police station, Officer J. A. Bailes read

[2]Mr. Hall was also licensed to drive commercial motor vehicles.

2

the West Virginia implied consent form to Mr. Hall, advising him that the penalty for refusal of submit to the secondary breath test was license revocation. Mr. Hall signed the implied consent form but refused to take the secondary breath test, stating that he wished to have a blood test. Officer Bailes testified that Mr. Hall told him "[a]t least twice" that he refused to take the test. Officer Bailes stated, "I specifically asked him twice, once he had a 15-minute period to change his mind."

Subsequently, Officer Harden was informed that Mr. Hall had refused the secondary breath test and had requested a blood test. Specifically, Officer Harden testified,

> By the time the wrecker came and had taken [Mr. Hall's] vehicle and I had gotten back to our headquarters, I was informed that Mr. Hall didn't want to take the breathalyzer, but wished to have blood drawn. So right before we left, I asked him again for the 15 minutes if he wanted to take it or have blood drawn. He would have rather had blood drawn.

Officer Harden explained that "the officers then processed, fingerprinted and photographed Mr. Hall, and then we took him and put him in the back of the police cruiser for transportation to Thomas Memorial Hospital [located in South Charleston, West Virginia] to have blood drawn." Ms. Andrea Gray withdrew blood from Mr. Hall at 4:26 a.m., and she gave the blood specimen to Officer Harden. Officer Keeney then transported Mr. Hall back to the South Charleston Police Department for arraignment and thereafter took him to the South Central Regional Jail.

3

Officer Harden testified that he "placed the blood sample into Evidence Locker No. 5 around 0541 hours in the morning for submission to the West Virginia State Police Laboratory." When Officer Harden later spoke with a technician at the South Charleston Police Department about the blood sample, he was informed that the West Virginia State Police Laboratory had not been accepting blood specimens, so the sample had not been submitted for analysis. Officer Harden testified that the blood sample remained at the police department.

Mr. Hall's driver's license was revoked by the DMV for both DUI *and* the refusal to submit to the designated chemical test, effective March 16, 2011. Mr. Hall's commercial driver's license was disqualified on the same grounds as of that date. The DMV regular driver's license revocation order provided that Mr. Hall's license was revoked for one year for "refusing the secondary chemical test" and six months for "driving under the influence."[3]

Mr. Hall requested an administrative hearing before the OAH, and such hearing was conducted on June 27, 2012, and October 17, 2012. Mr. Hall appeared but did not testify. On July 29, 2013, the OAH entered a "Decision of the Hearing Examiner and Final

---

[3]The commercial license revocation order was worded slightly differently, combining the penalty for the two separate infractions and revoking the license for a period of one year for "refusing the secondary chemical test and/or driving under the influence."

Order of the Chief Hearing Examiner" rescinding Mr. Hall's license revocation and disqualification. With regard to the implied consent form provided to Mr. Hall, the hearing examiner found that the investigating officer was not the officer who directed Mr. Hall to submit to the secondary breath test; "rather, this was done by another officer who did not arrest [Mr. Hall]." The hearing examiner also noted that the testimony "suggests that [Mr. Hall] may have been given a choice, or at least led to believe he had a choice, as to whether he wanted to take a breath test or whether he wanted to take a blood test." Based upon that issue, the hearing examiner stated: "Therefore, the portions of the Orders heretofore entered which disqualified [Mr. Hall] from driving a commercial vehicle and revoked his privilege to drive any motor vehicle for refusing to submit to a designated secondary chemical test should likewise be rescinded."

Further, the hearing examiner found that Mr. Hall was effectively denied an independent blood test "when the Investigating Officer failed to cause [Mr. Hall's] blood specimens to be submitted to a qualified laboratory for the specimens could be [sic] analyzed for their blood alcohol concentration." The hearing examiner found that the absence of the blood test "denied him the right to obtain evidence for his defense" and constituted a denial of "his due process rights." On the basis of the denial of the right to obtain a blood test, the hearing examiner stated:

> Based upon the foregoing analysis, the only appropriate
> sanction that can be imposed due to the denial of [Mr. Hall's]

5

right to the independent blood test is to rescind the portions of the Orders heretofore entered which disqualified [Mr. Hall] from driving a commercial motor vehicle and revoking his privilege to drive any motor vehicle for driving a motor vehicle in this state while under the influence of alcohol.

The circuit court entered a final order on March 6, 2014, upholding the OAH's order. The DMV now appeals to this Court and argues that the circuit court erred in upholding the OAH's rescission of the driver's license revocations.

## II. Standard of Review

This Court has previously established the standards for our review of a circuit court's order deciding an administrative appeal as follows:

> On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.

Syl. Pt. 1, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996). Syllabus point two of *Muscatell* provides: "In cases where the circuit court has [reversed] the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." With these standards as guidance, we consider the parties' arguments.

6

III. Discussion

This case is approached most effectively by addressing the independent components which inform this Court's ultimate determination. Specifically, the chronology of Mr. Hall's interactions with law enforcement personnel must be examined with emphasis upon compliance with statutory provisions relating to implied consent and the right to demand a blood test.

A. Implied Consent

West Virginia's implied consent law, codified in West Virginia Code § 17C-5-4 (2010)[4] provided, in relevant part, as follows:

> (a) Any person who drives a motor vehicle in this state is considered to have given his or her consent by the operation of the motor vehicle to a preliminary breath analysis and a secondary chemical test of either his or her blood, breath or urine for the purposes of determining the alcoholic content of his or her blood.
>
> . . . .
>
> (c) A secondary test of blood, breath or urine is incidental to a lawful arrest and is to be administered *at the direction of* the arresting law-enforcement officer having reasonable grounds to believe the person has committed an offense prohibited by section two of this article or by an ordinance of a municipality of this state which has the same elements as an offense

---

[4]West Virginia Code § 17C-5-4 (2010) applies in this case. The statute was amended in 2013, but those amendments do not affect the substantive issues evaluated in this opinion. West Virginia Code § 17E-1-15 (2005) provides a similar statutory scheme applicable to implied consent for commercial motor vehicle drivers.

7

described in section two of this article.

> (d) The law-enforcement agency that employs the law-enforcement officer shall designate which type of secondary test is to be administered: Provided, That if the test designated is a blood test and the person arrested refuses to submit to the blood test, then the law-enforcement officer making the arrest shall designate either a breath or urine test to be administered. Notwithstanding the provisions of section seven of this article, the refusal to submit to a blood test only may not result in the revocation of the arrested person's license to operate a motor vehicle in this state.

*Id*. (emphasis supplied). The secondary test to be administered, pursuant to subsection (d) above was the secondary breath test. Furthermore, West Virginia Code § 17C-5-7(a) (2010) provided, in relevant part, as follows:

> If any person under arrest as specified in section four [§ 17C-5-4] of this article refuses to submit to any secondary chemical test, the tests shall not be given: *Provided*, That prior to the refusal, the person is given an oral warning and a written statement advising him or her that his or her refusal to submit to the secondary test finally designated will result in the revocation of his or her license to operate a motor vehicle in this state for a period of at least forty-five days and up to life; and that after fifteen minutes following the warnings the refusal is considered final. The arresting officer after that period of time expires has no further duty to provide the person with an opportunity to take the secondary test.

This Court has held that "[a] person's driver's license may be suspended under W.Va.Code, 17C-5-7(a) [1983] for refusal to take a designated breathalyzer test." Syl. Pt. 2, *Moczek v. Bechtold*, 178 W. Va. 553, 553, 363 S.E.2d 238, 238 (1987). This is consistent

8

with the underlying principles of implied consent laws, which historically have been "'viewed as an effort on the part of the state to decrease the damage to persons and property arising from drivers operating motor vehicles while under the influence of intoxicating liquor.' *Jordan v. Roberts*, 161 W.Va. 750, 754, 246 S.E.2d 259, 262 (1978)." *State v. Stone*, 229 W. Va. 271, 283-84, 728 S.E.2d 155, 167-68 (2012); *see also People v. Jordan*, 142 Cal. Rptr. 401, 408 (Cal. Ct. App. 1977) (stating that "while the immediate purpose of the implied consent law is to obtain the best evidence of blood-alcohol content, the long range purpose is to inhibit intoxicated persons from driving upon the highways and thus reduce the carnage and slaughter on the highways.").

In the present case, Mr. Hall contends that the investigating officers failed to comply with statutory provisions relating to the implied consent form and that the automatic revocation of Mr. Hall's driver's license for refusal to submit to the secondary breath test was therefore not warranted. The hearing examiner and the circuit court agreed with Mr. Hall's contentions that the investigatory personnel failed to comply with statutory provisions by (1) failing to demonstrate that the "arresting officer" provided the implied consent form to Mr. Hall, and (2) presenting Mr. Hall with an alleged "choice" between a breath test and a blood test. We examine these two issues regarding implied consent separately below.

1. Information Provided by Officer Bailes Regarding Implied Consent Penalties

The hearing examiner found as follows:

[A]lthough West Virginia Code § 17C-5-4 requires that a secondary chemical test be administered at the direction of the arresting law-enforcement officer, the testimony in the present case reveals that it was Officer J.A. Bailes, rather than the Investigating Officer, who directed the Petitioner [Mr. Hall] to submit to a secondary chemical test of his breath.

This Court has never held, however, that the statute's use of the phrase "at the direction of" precludes any delegation of authority from the arresting officer to another law enforcement officer. In this case, Officer Harden testified that he waited for the wrecker at the scene of the arrest while Mr. Hall was transported to the police station. Officer Bailes testified that he read the implied consent form to Mr. Hall and provided Mr. Hall with a copy of the form. Officer Bailes further testified that Mr. Hall told him at least twice that he did not want to take the secondary breath test.

The California Court of Appeal, in *Lee v. Department of Motor Vehicles*, 142 Cal.App.3d 275 (Cal. Ct. App. 1983), addressed and rejected a similar assertion that delegation of authority was improper.[5] *Id.* at 280-81. In that case, a driver accused of DUI contended that "because the test was not going to be administered by the *arresting officer* who had reasonable cause, appellant did not violate [the implied consent statute] even if he did refuse to submit to a chemical test for intoxication." *Id.* at 280-81 (emphasis supplied).

---

[5]The implied consent statute applicable in *Lee* was nearly identical to the West Virginia implied consent statute. *See* 142 Cal.App.3d at 281.

The court disagreed with the driver's statutory interpretation and explained "that the language in the statute requiring the test to be administered 'at the direction' of an arresting officer with reasonable cause means that the arresting officer need only order that the test be given." *Id*. at 281. "The statute does not say that the arresting officer must personally administer the test or even that the test must be administered in the presence of the arresting officer." *Id.* (footnote omitted).

Although Mr. Hall did not present policy arguments opposing the concept of delegation, it is enlightening to recognize the multiple policy arguments presented and rejected in *Lee*. The accused driver, for instance, argued that the implied consent "statute is designed to protect the arrestee's due process rights which may be violated if the administration of the tests is not limited to the arresting officer." *Id.* The court in *Lee* found no factual or legal justification for such contention and specified that the implied consent statute was "enacted to fulfill the need for a fair, efficient and accurate system of detection and prevention of drunken driving." *Id*. at 282 (citations omitted). The discussion in *Lee* appropriately focused upon the underlying purposes of the implied consent law, noting that while the "immediate purpose" is to produce the most reliable evidence of intoxication, the "long range purpose is to deter intoxicated persons from driving on the highways." *Id.* The court in *Lee* concluded that nothing in the foundational principles of implied consent law militates against the delegation at issue in that case. The court also noted that "[r]emedial

11

statutes . . . must be liberally construed to effect their objects and suppress the mischief at which they are directed." *Id*. (quoting *Bush v. Bright,* 264 Cal.App.2d 788, 792 (Cal. Ct. App. 1968)).

The delegation at issue in the case at bar was completely consonant with the statutory purposes of West Virginia's implied consent law. This Court has consistently recognized the need for multiple officers to work in concert in investigating incidents of allegedly criminal behavior. *See* C*omm'r of W. Va. Div. of Motor Vehicles v. Brewer,* No. 13-0501, 2014 WL 1272540, at *1 (W. Va. Mar. 28, 2014) (memorandum decision) (holding that investigating officer's completion of DUI Information Sheet based mostly on information learned from another officer at scene did not invalidate ultimate finding of DUI); *Dale v. McCormick*, 231 W.Va. 628, 634, 749 S.E.2d 227, 233 (2013) (allowing multiple officers to observe driver during twenty-minute observation period). We find Mr. Hall's arguments to the contrary unconvincing, and we hold that the language of West Virginia Code § 17C-5-4(c) (2010), requiring a secondary blood or breath test to be administered "at the direction of the arresting law-enforcement officer," does not preclude the arresting officer from directing or authorizing another qualified law enforcement officer to explain implied consent and administer a chemical test for intoxication.[6]

_____

[6]In the statutory framework under inquiry in this case, the only relevant mention of the presence of the arresting officer is contained in West Virginia Code § 17C-5-4(g), where the arresting officer is required to be present during the administration of a secondary chemical

## 2. Alleged "Choice" Provided by Officer Harden

West Virginia Code § 17C-5-7(a) provides requirements regarding refusal to submit to chemical testing and specifies that "after fifteen minutes following the warnings the refusal is considered final." Furthermore, "[t]he arresting officer after that period of time expires has no further duty to provide the person with an opportunity to take the secondary test." *Id.*

In this case, Officer Bailes testified that he read and provided a copy of the implied consent form to Mr. Hall. In response to that information, Mr. Hall informed Officer Bailes that he did not want to take the secondary breath test. Mr. Hall refused "[a]t least twice," according to Officer Bailes' testimony. The officer explained: "I specifically asked him twice, once he had a 15-minute period to change his mind." The implied consent form read and provided to Mr. Hall explained as follows:

> Pursuant to state law (Chapter17C, Article 5, Section 7) I am now directing you to take an approved secondary chemical test of your breath for the purpose of determining the alcoholic content of your blood.
>
> If you refuse to submit to this test, your privilege to operate a motor vehicle in this state will be revoked for a period of at least 45 days and up to life.
>
> If you refuse you will have fifteen minutes in which to change

---

test if the arresting officer lacks proper training and requests another officer to administer the test. Those circumstances were nonexistent in the present case.

your mind after which time your refusal will be deemed final and the arresting officer will have no further duty to offer you this approved secondary chemical test.

Officer Bailes and Mr. Hall signed that document on February 3, 2011, at 3:52 a.m.

It was only *after* the conclusion of that pivotal conversation that Officer Harden returned to the police station, learned of Mr. Hall's decision, and decided to approach Mr. Hall one more time concerning his refusal to take the secondary breath test. While this Court takes cognizance of Officer Harden's laudable desire for thoroughness, his act of approaching Mr. Hall yet again on the issue was unnecessary. As previously referenced, Officer Harden testified as follows regarding his actions at that juncture:

> By the time the wrecker came and had taken [Mr. Hall's] vehicle and I had gotten back to our headquarters, I was informed that Mr. Hall didn't want to take the breathalyzer, but wished to have blood drawn. So right before we left, I asked him again for the 15 minutes if he wanted to take it or have blood drawn. He would have rather had blood drawn.

Based upon these statements by Officer Harden, obviously made subsequent to Mr. Hall's refusal to submit to the secondary breath test, the hearing examiner and circuit court concluded that Mr. Hall was in some manner given a *choice* of which test to take. However, the evidence does not support the conclusion that Mr. Hall had been provided a "choice" between the breath test and the blood test. The evidence clearly indicates that Officer Bailes read and provided the implied consent form to Mr Hall; Mr. Hall signed that document; and Mr. Hall *twice* refused the breath test and asked for a blood test. At that point, Mr. Hall's

14

refusal of the breath test was complete, and he had been made aware that the penalty for refusing the breath test was license revocation. Thus, by the refusal, Mr. Hall had subjected himself to the license revocation later imposed by the DMV. The events or conversations occurring when Officer Harden returned to the station are immaterial; Mr. Hall's refusal was already complete.

There is no conflict in the testimony regarding these events. As this Court noted in *Lilly v. Stump*, 217 W.Va. 313, 617 S.E.2d 860 (2005), "[i]n fact, the only evidence of record on this issue was Deputy Lilly's testimony which clearly demonstrated that the officer gave the Implied Consent form to the appellee. As there was no testimony in conflict with the officer, we see no reason to contradict his testimony." *Id*. at 319, 617 S.E.2d at 866. The findings of the lower tribunals that such chronological scenario can be interpreted to mean Mr. Hall was given a "choice," was misled in some manner, or had any rational basis for perceiving a "choice" between the breath test and the blood test are unfounded. Mr. Hall's refusal to submit to the secondary breath test is determinative of his revocation. This Court consequently reverses the portion of the lower court's finding regarding the revocation for this refusal.

B. Absence of Results of Blood Test

15

West Virginia Code § 17C-5-9 (1983)[7] provided as follows:

> Any person lawfully arrested for driving a motor vehicle in this State while under the influence of alcohol, controlled substances or drugs shall have the right to demand that a sample or specimen of his blood, breath or urine be taken within two hours from and after the time of arrest, and that a chemical test thereof be made. The analysis disclosed by such chemical test shall be made available to such arrested person forthwith upon demand.

This Court addressed that statute in *Moczek* and unequivocally held that a driver's license will be revoked on the basis of the driver's refusal to submit to a breath test, whether a blood test is taken or not. 178 W. Va. at 554, 363 S.E.2d at 239. Specifically, this Court observed:

> It is clear that even though Mr. Moczek had a right to a blood test in addition to the secondary chemical test designated by the state police under W. Va. Code, 17C-5-4 [1983], in this case the breathalyzer, the fact that he refused to take the designated breathalyzer automatically subjected him to administrative suspension of his driver's license.

*Id.*; *see also Chapman v. W. Va. Dep't of Motor Vehicles,* 188 W. Va. 216, 423 S.E.2d 619 (1992) (holding license could be suspended for refusal to submit to breath test following arrest for DUI, despite driver's willingness to undergo blood test). This Court in *Moczek* further explained:

> W. Va. Code, 17C-5-9 [1983] does not require that an alternative test be offered; it merely accords an additional right to individuals to have another test to supplement the designated secondary test if that designated secondary test is either a breath

---

[7]West Virginia Code § 17C-5-9 (1983) applies in this case. The statute was amended in 2013, but those amendments do not affect the substantive issues evaluated in this opinion.

16

> or urine test. *It is clear now that a person who refuses to take the designated breathalyzer or urine test will have his license revoked, even if he takes an alternative blood test that conclusively proves that he was not intoxicated.*

*Id.* at 555, 363 S.E.2d at 240 (emphasis supplied).[8]

Applying that logic to the present case, it is clear that Mr. Hall's administrative license revocation is properly premised upon his refusal of the breathalyzer test. As this Court observed in *Moczek*, "the results of the blood test would have been irrelevant to the

---

[8]As the Supreme Court of Utah aptly explained in *Conrad v. Schwendiman*, 680 P.2d 736 (Utah 1984), a statute permitting a driver to request a blood test "does not supersede or negate" an implied consent statute. *Id.* at 739. "If the driver refuses to take the test requested by the officer, his driver's license must be revoked." *Id.* A blood test simply "provides the defendant with additional means . . . to muster a defense to a charge of driving under the influence." *Id.*

Moreover, we note that a court addressing *only* the administrative license revocation based upon refusal to submit to the breathalyzer under the implied consent statute would not be obligated to address the driver's concerns about the absence of a requested blood test. As the California Court of Appeal concisely noted in *Webb v. Miller*, 187 Cal.App.3d 619 (Cal. Ct. App. 1986), those two issues are entirely separate. *Id.* at 629. While deprivation of a blood test prevents the accused from obtaining evidence for his defense of the DUI claim, it does not affect the issue of refusal to submit to the testing required by the police through the implied consent law. Any contention regarding the absence of a blood test "is a red herring" in a case dealing *exclusively* with the implied consent issue. *Id.* "The issue here is not whether Webb was driving while under the influence of alcohol, but rather, his refusal to submit to chemical testing. Consequently, even a test result favorable to Webb would have no bearing on whether he violated [the implied consent law]." *Id.*

In the instant case, this Court addresses *both* the implied consent *and* the blood test components of this case *only* because the DMV revocation order dealt with the two infractions separately and imposed individual penalties for each, revoking Mr. Hall's regular driver's license for one year for the refusal *and* six months for the DUI, to run concurrently. His commercial driver's license was revoked for a combined one year.

outcome of the narrow issue of whether Mr. Moczek's license should be suspended because appellant's refusal to take the designated breathalyzer test immediately after his arrest made the present case one of administrative revocation." *Id.*

The Court in *Moczek* was careful to emphasize, however, that Mr. Moczek's license was "suspended because he refused to take the breathalyzer test, and not because he was driving while under the influence of alcohol." *Id.* In that manner, *Moczek* differs from the present case; here, the DMV identified two separate bases for revocation and specified that Mr. Hall's licenses were being revoked for one year for "refusing the secondary chemical test" *and* six months for "driving under the influence." By statute, those revocation periods were ordered to run concurrently.

Consequently, having already concluded that the revocation for "refusing the secondary chemical test" was appropriate, this Court must also analyze the second basis for the DMV's order and determine whether the six-month revocation for "driving under the influence" was appropriate in this situation. Although a blood sample was taken, a "chemical test thereof," as required by West Virginia Code § 17C-5-9, was never performed. Moreover, the sample was retained under the control of the police department and was placed in an evidence locker when Officer Harden returned to the police station on February 3, 2011. Officer Harden's intention at that time was to have the blood sample tested by the

18

West Virginia State Police Laboratory.[9]  When he testified during a June 2012 hearing, however, Officer Harden explained:

> A few months ago I had talked to our evidence technician in [sic] whether or not we had gotten anything back from the state police lab in reference to the blood sample, and he said that during that time the West Virginia State Police was not accepting blood, so it was not submitted.  We still have it in our department.  No additional explanation for the failure to test the blood sample was provided.

On appeal to this Court, the DMV contends that the circuit court and OAH erred in finding that it was the investigating officer's obligation to have the blood sample tested.  The DMV argues that Mr. Hall could have made an attempt to secure the blood sample for testing.  The DMV directs this Court's attention to *In re Burks*, 206 W.Va. 429, 525 S.E.2d 310 (1999).  In *Burks*, however, the essential requirements of the statute were satisfied; the question was whether the failure of the officer to *supply the results* of the test was a substantial denial of due process.  *Id*. at 432, 525 S.E.2d at 313.  The Court held as follows in syllabus point two:

> A person who is arrested for driving under the influence who requests and is entitled to a blood test, pursuant to W.Va. Code, 17C-5-9 [1983], must be given the opportunity, with the assistance and if necessary the direction of the arresting law enforcement entity, to have a blood test that insofar as possible

---

[9]Officer Harden indicated on the West Virginia DUI Information Sheet that an analysis of [Mr. Hall's] blood would be performed by the West Virginia State Police Laboratory.

19

meets the evidentiary standards of 17C-5-6 [1981].

That test having been performed in *Burks*, however, the officer did not have the obligation to obtain and furnish the results. The Court explained at syllabus point three: "The requirement that a driver arrested for DUI must be given a blood test on request does not include a requirement that the arresting officer obtain and furnish the results of that requested blood test." The Court in *Burks* further explained that "[p]lacing such a requirement on the arresting officer can only be fairly read into the statutory scheme, if the blood test is the officer's 'designated' test - and not a test that is requested by the driver." *Id.* at 433, 525 S.E.2d at 314. "Of course, the arresting officer cannot pose an impediment to the driver's obtaining the results of and information about the test." *Id.*[10]

In *State v. York*, 175 W. Va. 740, 338 S.E.2d 219 (1985), this Court discussed the evidentiary implications of a denial of a blood test and reasoned as follows:

> To deny this right would be to deny due process of law because such a denial would bar the accused from obtaining evidence necessary to his defense. . . . The defendant's right to request *and receive* a blood test is an important procedural right that goes directly to a court's truth-finding function.

*Id*. at 741, 338 S.E.2d at 221 (citations omitted and emphasis supplied); *see also Koontz v. State,* 617 S.E.2d 207, 207-10 (Ga. 2005) (holding, in criminal context, that police officer

---

[10]While the precise statutory standards vary by state, other jurisdictions have also adhered to the central theme that an officer may not unreasonably impede the right to the blood test requested by the driver. *See, e.g.*, *State v. Smerker*, 136 P.3d 543 (Mont. 2006).

failed to reasonably accommodate driver's request for independent blood subsequent to required breath test where blood drawn but not tested, with no further inquiry by police officer); *Cole v. State*, 587 S.E.2d 314 (Ga. App. 2003) (holding that officer took no steps to help overcome obstacle created by hospital's inability to test blood sample); *State v. Button*, 426 S.E.2d 194 (Ga. Ct. App. 1992) (finding officer's innocent mistake in failure to test blood sample not relevant); *O'Dell v. State*, 409 S.E.2d 54 (Ga. Ct. App. 1991) (holding officer unjustifiably refused driver's repeated requests to call other hospitals to have blood sample tested).

In the case sub judice, the investigative personnel complied with only one portion of West Virginia Code § 17C-5-9.  They transported Mr. Hall to Thomas Memorial Hospital, and a blood sample was taken.  The subsequent statutory requirement, however, was not satisfied because a blood test on that blood sample was never conducted.  The DMV contends that the burden of proceeding from blood sample to blood test is upon Mr. Hall because he requested the blood test.  On the contrary, Mr. Hall argues that the statute creates a due process right to *both demand and receive* a blood test and that the act of retaining the blood sample in an evidence locker rather than ascertaining that a blood test be performed on the blood sample constitutes denial of due process.

Although the circumstances in *Burks* were similar to the present case, the

21

statutory right of the driver in *Burks* to demand *and receive* a blood test was satisfied. This Court's holding in *Burks* was simply that the police officer did not have the obligation to "obtain the results" of the blood test. 206 W.Va. at 433, 525 S.E.2d at 314. In other words, those results of the *completed blood test* were available to the driver, and the failure of the driver to obtain those results was not attributable to police inaction. The present case, however, involves somewhat more culpable conduct by investigative personnel. The police actually retained dominion and control over the blood sample, in evidence locker number five of the South Charleston Police Department. Although they may have *intended* to cause that sample to be tested by the West Virginia State Police Laboratory, no such test was ever conducted. This Court consequently affirms the conclusion of the hearing examiner and circuit court that Mr. Hall was denied the statutory and due process rights, under West Virginia Code § 17C-5-9, to have his blood tested independently. We therefore affirm the portion of the circuit court order that rescinds the DMV's six-month license revocation for DUI.

## IV. Conclusion

Based upon the foregoing, this Court finds that Mr. Hall's license revocations for refusal to submit to the secondary breath test were proper, but his license revocations for DUI were erroneous. Thus, this Court reverses the portion of the circuit court's order rescinding the one-year license revocation for refusal to submit to the secondary breath test and affirms the portion of such order rescinding the six-month license revocation for DUI.

22

We remand to the circuit court for entry of an order reinstating the portions of the license revocation order and commercial driver's license disqualification order pertaining to the implied consent violation.

Affirmed in part, reversed in part, and remanded.