**FILED**
**June 15, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2021 Term

_____

No. 20-0134

_____

EVERETT FRAZIER, COMMISSIONER OF
THE WEST VIRGINIA DIVISION
OF MOTOR VEHICLES,
Petitioner

v.

NATHAN TALBERT,
Respondent

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Louis H. Bloom, Judge
Civil Action No. 19-AA-100

REVERSED AND REMANDED WITH DIRECTIONS

_____

Submitted: April 20, 2021
Filed: June 15, 2021

Patrick Morrissey, Esq.
West Virginia Attorney General
Elaine L. Skorich, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Petitioner

Gregory W. Sproles, Esq.
Gregory W. Sproles, PLLC
Summersville, West Virginia
Counsel for Respondent

JUSTICE HUTCHISON delivered the Opinion of the Court.
JUSTICE WOOTON dissents and reserves the right to file a dissenting opinion.

**SYLLABUS BY THE COURT**

1.      "'On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo;* findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.' Syl. Pt. 1, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996)."  Syl. Pt. 1, *Dale v. Odum*, 233 W.Va. 601, 760 S.E.2d 415 (2014).

2.      "Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: '(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.'"  Syl. Pt. 2, *Shepherdstown Volunteer Fire Dept. v. State ex rel. State of W.Va. Human Rights Comm'n*, 172 W.Va. 627, 309 S.E.2d 342 (1983).

3.     "There are no provisions in either W.Va. Code, 17C-5-1, *et seq.,* or W.Va. Code, 17C-5A-1, *et seq.,* that require the administration of a chemical sobriety test in order to prove that a motorist was driving under the influence of alcohol, controlled substances or drugs for purposes of making an administrative revocation of his or her driver's license." Syl. Pt. 4, *Coll v. Cline*, 202 W. Va. 559, 505 S.E.2d 662 (1998).

4.     "'Where there is evidence reflecting that a driver was operating a motor vehicle upon a public street or highway, exhibited symptoms of intoxication, and had consumed alcoholic beverages, this is sufficient proof under a preponderance of the evidence standard to warrant the administrative revocation of his driver's license for driving under the influence of alcohol.' Syl. Pt. 2, *Albrecht v. State,* 173 W.Va. 268, 314 S.E.2d 859 (1984)." Syl. Pt. 5, *Reed v. Hill*, 235 W. Va. 1, 770 S.E.2d 501(2015).

5.     "A person who is arrested for driving under the influence who requests and is entitled to a blood test, pursuant to *W.Va.Code,* 17C-5-9 [1983], must be given the opportunity, with the assistance and if necessary the direction of the arresting law enforcement entity, to have a blood test that insofar as possible meets the evidentiary standards of 17C-5-6 [1981]." Syl. Pt. 2, *In re Burks*, 206 W. Va. 429, 525 S.E.2d 310 (1999).

6.     In a proceeding involving the revocation of a driver's license for driving under the influence of alcohol, controlled substances, or drugs where a driver

demands a blood test pursuant to West Virginia Code § 17C-5-9 [2013], but the test is never given, a chemical analysis of the blood that is withdrawn is never completed, or the blood test results are lost, the trier of fact must consider (1) the degree of negligence or bad faith involved in the violation of the statute; (2) the importance of the blood test evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the proceeding to sustain the revocation. The trier of fact must consider these factors in determining what consequences should flow from the absence of the blood test evidence under the particular facts of the case.

**HUTCHISON, Justice**:

Petitioner Everett Frazier, Commissioner of the West Virginia Division of Motor Vehicles ("the Commissioner" or "DMV"), seeks the reinstatement of an order revoking the driving privileges of Respondent Nathan Talbert for driving a motor vehicle while under the influence of alcohol, controlled substances and/or drugs with a blood alcohol content of .15 or higher ("aggravated DUI"). By order entered on January 21, 2021, the Circuit Court of Kanawha County, West Virginia, affirmed the decision of the Office of Administrative Hearings ("OAH") reversing the revocation order on the ground that the investigating officer's refusal to grant respondent's requests for a blood test following his arrest violated respondent's statutory and due process rights and that prior decisions issued by this Court required that the revocation be reversed.

Upon careful consideration of the parties' briefs and oral arguments, the appendix record, and the pertinent legal authority, and for the reasons set forth below, we reverse the circuit court's order and remand this matter for further proceedings.

## I.    Factual and Procedural Background

On January 20, 2015, Deputy John Ellison of the Nicholas County Sheriff's Department was on patrol in Summersville, West Virginia. At approximately 12:59 a.m., he observed a black GMC Sierra go off the right side of the roadway on Broad Street. As he continued to follow the vehicle onto Route 19, Deputy Ellison observed it cross the white line, go off the roadway several times, and "at Salmon Run, you have a turning lane

to go onto Airport Road. I observed the vehicle while negotiating that turn to go into the turn lane and then come back onto Route 19." Deputy Ellison then conducted a stop of the vehicle, which was being driven by respondent.[1]

Deputy Ellison approached the driver's side of the vehicle and began speaking with respondent. Deputy Ellison noticed a strong odor of alcoholic beverage emitting from the vehicle and, when he asked respondent if he had been drinking, respondent answered that he had had "a few."[2]

Deputy Ellison then asked respondent to exit the vehicle. According to the D.U.I. Information Sheet, respondent exited his vehicle normally, walked to the roadside normally, but was unsteady while standing. Respondent's speech and attitude were noted as "good." His eyes were noted as "blood shot, glassy."

Deputy Ellison explained and administered three field sobriety tests, each of which respondent failed. Prior to administering the horizontal gaze nystagmus test, Deputy

---

[1] Seated next to respondent in the vehicle was a female passenger. Deputy Ellison and respondent agreed that she was "quite intoxicated." Respondent testified that his passenger was acting in a sexually aggressive manner towards him while he was driving, which, he contended, may have caused him to swerve his vehicle.

[2] According to Deputy Ellison, when he first approached the vehicle, respondent asked, "how bad was it?" Deputy Ellison testified, "I guess that's from where he went off the road there." However, respondent testified that the question was in reference to the speed of his vehicle – i.e., how fast he was driving.

Ellison conducted a medical assessment of respondent's eyes, which indicated equal pupils, no resting nystagmus, and equal tracking in both eyes. During the test, respondent exhibited lack of smooth pursuit, distinct and sustained nystagmus, and the onset of nystagmus prior to an angle of 45 degrees in both eyes.

Deputy Ellison also demonstrated the walk-and-turn test. The D.U.I. Information Sheet noted that respondent "cannot keep balance," "steps off line," "misses heel-to-toe"; and "raises arms to balance." Finally, with regard to the one-leg-stand test, respondent swatted while balancing, used his arms to balance, and put his foot down.

Deputy Ellison, who was trained and certified to administer the preliminary breath test ("PBT") using the Alco-Sensor FST, administered the test to respondent at 1:19 a.m., after first observing him for at least fifteen minutes to ensure that he did not smoke or consume alcoholic beverages. The result of the PBT indicated that respondent had a breath alcohol concentration of .205%.

Having reasonable grounds to believe that respondent was driving under the influence of alcohol, Deputy Ellison arrested respondent and transported him to the Nicholas County Sheriff's Department for processing and to administer the designated secondary chemical test ("SCT") of the breath. Deputy Ellison was trained at the West Virginia State Police Academy to operate the Intoximeter EC/IR-II and was certified to administer the SCT. Deputy Ellison read to respondent the West Virginia Implied Consent

3

Statement, which respondent then signed at 1:55 a.m. Deputy Ellison completed the Breath Test Operational Checklist and, at 2:36 a.m., respondent gave a breath sample. Respondent's blood alcohol concentration ("BAC") was recorded as .159%.

On July 2, 2015, the DMV sent respondent an Order of Revocation for operating a motor vehicle while under the influence of alcohol while having a BAC of ".15 or higher."[3]

Respondent thereafter timely submitted the Written Objection and Hearing Request Form on which he indicated that he wished to challenge his "stop and arrest and the basis for such stop and/or arrest." He also checked the box indicating that he "wish[ed] to challenge the results of the secondary chemical test of the blood, breath or urine."

An administrative hearing was conducted before the OAH on February 25, 2016. In addition to all of the foregoing, video evidence taken at the sheriff's department from the night of the arrest showed that respondent asked Deputy Ellison three times for a blood test. *See* W. Va. Code § 17C-5-9 [2013]. At the hearing, Deputy Ellison testified that

---

[3] *See* W. Va. Code § 17C-5A-2(k)(1) ("If in addition to finding by a preponderance of the evidence that the person did drive a motor vehicle while under the influence of alcohol, controlled substances or drugs, the [OAH] also finds by a preponderance of the evidence that the person did drive a motor vehicle while having an alcohol concentration in the person's blood of [.15] or more, by weight, the commissioner shall revoke the person's license for a period of forty-five days with an additional two hundred and seventy days of participation in the Motor Vehicle Alcohol Test and Lock Program").

he explained to respondent that blood tests are only to be conducted in cases where a driver has been accused of driving under the influence of controlled substances (rather than alcohol).

On cross-examination, Deputy Ellison confirmed that the video showed that respondent asked "coherent," "appropriate," and "very specific" questions; "carr[ied] on a coherent conversation" with Deputy Ellison; was "totally cooperative"; answered Deputy Ellison's "questions regarding direction of travel, date, day of the week, and time all accurately"; and denied that he was under the influence of alcohol, controlled substances, or drugs. Deputy Ellison further admitted that, earlier in his testimony, he failed to recount that, when he initially observed respondent's vehicle swerving on Broad Street, that respondent pulled off the roadway and Deputy Ellison passed him. Respondent's counsel further pointed out on cross-examination of Deputy Ellison that the video showed that respondent, who was wearing sandals, walked with a limp, but that Deputy Ellison never inquired of respondent why he walked with a limp. Similarly, Deputy Ellison was asked why his medical assessment relative to respondent's eyes on the D.U.I. Information Sheet failed to include a notation that respondent has a "lazy eye" but, instead, noted that his eyes had equal pupils, denied resting nystagmus, and had equal tracking. Finally, Deputy Ellison confirmed that, during his D.U.I. training at the West Virginia State Police Academy, he was never informed that, under West Virginia law, a driver arrested for driving while under the influence of alcohol is entitled to a blood test if he or she requests one.

5

Respondent also testified at the administrative hearing. He denied that, at the time of his arrest, he was driving while under the influence of alcohol. He testified that he has always had a "lazy eye," and that he was shot in the left leg nineteen years earlier, causing him to "los[e] two arteries in my leg and muscle," to walk with a limp, and to be unable to stand on the left leg and "try to put a foot up" without losing his balance. Respondent also refuted Deputy Ellison's testimony that he (Ellison) properly conducted the resting nystagmus test, stating that he moved the pen back and forth "fairly quickly." Respondent further testified that Deputy Ellison failed to demonstrate the walk-and-turn test but affirmed that, nonetheless, he (respondent) "walk[ed] the number of steps [Deputy Ellison] told [him] to walk"; that he touched heel to toe; and that he did not use his arms for balance. Respondent further testified that, "[w]ithin a minute" before he blew into the Alco-Sensor FST, he had spit out "Copenhagen" (i.e., tobacco).

In a Final Order entered on August 5, 2019, the OAH reversed the order revoking respondent's driving privileges for the offense of DUI with an alcohol concentration level of .15% or more. The OAH found that Deputy Ellison observed respondent "weaving, almost striking an object or vehicle, driving with tires on the center line marker and swerving on Route 19," and that respondent's vehicle was lawfully stopped. The OAH further found that respondent was lawfully arrested for DUI based upon "[t]he odor of an alcoholic beverage emitting from [respondent's] breath along with the visible signs of impairment and the inability to adequately perform field sobriety tests,

6

including the preliminary breath test. Plus the admission by [respondent] that he drank a few at a bar."[4]

However, the OAH concluded that West Virginia Code § 17C-5-9 affords an individual arrested for D.U.I. "'a right to demand and receive a blood test within two hours of arrest,' Syllabus [P]oint 1, [in part,] *State v. York*, 175 W. Va. 740, 338 S.E.2d 219 (1985) [,]" and that, "when an individual arrested for [DUI] requests an independent blood test, the arresting law-enforcement entity is required to provide the individual with an opportunity to have a blood test." *See* Syl. Pt. 2, *In re Burks*, 206 W. Va. 429, 310 S.E.2d 310 (1999). Finally, relying on *Reed v. Hall*[5] and *Reed v. Divita*,[6] the OAH determined that Deputy Ellison's failure to comply with respondent's demand for a blood test violated respondent's due process rights under West Virginia Code § 17C-5-9 and was grounds for reversal of the revocation order.

The DMV appealed the OAH's final order to the Circuit Court of Kanawha County. The circuit court affirmed the decision of the OAH by order entered on January 21, 2020. Concluding that *Hall* and *Divita* were dispositive of the matter given the

---

[4] Notably, the OAH's Final Order failed to find (or even mention) the SCT result of .159% even though respondent did not challenge the result at the administrative hearing.

[5] 235 W. Va. 322, 773 S.E.2d 666 (2015).

[6] No. 14-11018, 2015 WL 5514209 (W. Va. Sept. 18, 2015) (memorandum decision).

undisputed evidence that respondent "requested a blood test and Deputy Ellison refused to grant as much due to his ignorance of the law," the circuit court determined that the OAH properly reversed the order of revocation "based on a violation of the [r]espondent's due process right to a blood test."

The circuit court also addressed the DMV's argument that Deputy Ellison's mistake of law – that is, his misapprehension that a demand for a blood test must be granted only in cases where a driver is suspected of driving while under the influence of controlled substances (but not alcohol) – was "reasonable" and that "the OAH erred in ignoring the unrebutted evidence of aggravated DUI." The circuit court rejected the DMV's argument that "objectively reasonable mistakes of law do not rise to the level of a constitutional violation." Rather, the circuit court concluded that the statutory due process right of a driver suspected of DUI to obtain a blood test has existed for nearly thirty-five years in West Virginia and is, thus, a well-established right. *See State v. York*, 175 W. Va. 740, 338 S.E.2d 219 (1985). The circuit court determined that "officers do not commit objectively reasonable mistakes of law when denying this right. Instead, as repeatedly held by the State Supreme Court, this denial implicates the driver's due process rights and thus mandates reversal of the *Order of Revocation*." It is from the circuit court's January 21, 2020, order that the DMV now appeals.

## II.    Standard of Review

This Court reviews a circuit court's order in an administrative appeal under the following standard:

> "On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W.Va.Code § 29A-5-4(a) and reviews questions of law presented *de novo;* findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. Pt. 1, *Muscatell v. Cline,* 196 W.Va. 588, 474 S.E.2d 518 (1996).

Syl. Pt. 1, *Dale v. Odum,* 233 W. Va. 601, 760 S.E.2d 415 (2014).

Further,

> [u]pon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: "(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

Syl. Pt. 2, *Shepherdstown Volunteer Fire Dept. v. State ex rel. State of W.Va. Human Rights Comm'n,* 172 W. Va. 627, 309 S.E.2d 342 (1983). With these standards in mind, we address the parties' arguments.

### III.    Discussion

On appeal, the Commissioner argues that the lower tribunals erred in reversing the order of revocation based exclusively upon the investigating officer's failure to satisfy respondent's demand for a blood test following his arrest. The Commissioner contends that it was error to reverse the revocation without regard for the other, unrebutted evidence of aggravated DUI, including a SCT result showing that respondent had a blood alcohol concentration of .159%. Significantly, the Commissioner urges this Court to revisit our decisions in *Hall* and *Divita* because the judicially created remedy applied in those cases improperly requires the automatic reversal of revocation orders where West Virginia Code § 17C-5-9 is not followed, allowing drivers who have otherwise been proven to have operated a motor vehicle while under the influence of alcohol, drugs, or a combination of both, to remain on the road and avoid administrative sanctions. The Commissioner argues that, while automatic reversal of a revocation order for an officer's failure to follow West Virginia Code § 17C-5-9 *may* be warranted in a *criminal* DUI case, such a drastic remedy is not appropriate in an administrative revocation proceeding. Finally, the Commissioner proposes that the Court adopt a test that, in the interest of fundamental fairness, would require the factfinder to evaluate the violation of West Virginia Code § 17C-5-9 in the context of the entire record. *See State v. Osakalumi*, 194 W. Va. 758, 461 S.E.2d 504

10

(1995). Under such a test, the Commissioner argues, there was sufficient evidence presented that respondent was operating his vehicle while under the influence of alcohol requiring that the revocation be upheld.

Respondent counters that the circuit court's order upholding the OAH's reversal of the DMV's order of revocation should be affirmed. He contends that his statutory and due process rights were violated when he was three times denied a request for a blood test, in violation of West Virginia Code § 17C-5-9, and that the lower tribunals' orders correctly followed the decisions of this Court in *Hall* and *Divita* in reversing the order of revocation on that ground. In any event, even if the OAH were to consider the other evidence of aggravated DUI, respondent disputes the Commissioner's claim that the evidence of DUI was not refuted at the administrative hearing, pointing to the fact that he challenged the validity of the horizontal gaze nystagmus and one-leg-stand tests and maintained that, despite Deputy Ellison's claim to the contrary, he successfully performed the walk-and-turn test. Respondent also called into question the credibility of Deputy Ellison, who did not admit that respondent demanded a blood test until, on cross-examination, he was confronted with a video recording reflecting the same. Respondent contends that the Commissioner failed to demonstrate, by a preponderance of the evidence, that he was driving under the influence of alcohol, controlled substances, and/or drugs.

In resolving this appeal, we are mindful that the underlying proceeding is that of an administrative revocation of respondent's driving privileges for driving while under the influence of alcohol, controlled substances, and/or drugs, with a blood alcohol

11

concentration of eight hundredths of one percent, or more, by weight. *See* W. Va. Code § 17C-5A-2(e) [2015]. More specifically, in this case, respondent's driver's license was revoked for operating a motor vehicle while having a blood alcohol concentration greater than .150%, or aggravated DUI, as demonstrated by SCT results showing that respondent had a blood alcohol concentration of .159%. *See* W. Va. Code § 17C-5A-2(k)(1).

It is well settled that the legislative procedures for the administrative revocation of a driver's license are intended to promote safety on our roads and highways and protect the innocent public from persons who drive under the influence of alcohol and/or drugs. *See e.g.*, *Reed v. Haynes*, 238 W. Va. 363, 368, 795 S.E.2d 518, 523 (2016); *Carroll v. Stump*, 217 W. Va. 748, 755, 619 S.E.2d 261, 268 (2005); *Jordan v. Roberts,* 161 W.Va. 750, 758, 246 S.E.2d 259, 264 (1978). *See also Johnson v. Commissioner,* 178 W.Va. 675, 677, 363 S.E.2d 752, 754 (1987); *State ex rel. Ruddlesden v. Roberts,* 175 W.Va. 161, 164, 332 S.E.2d 122, 126 (1985) (recognizing "[t]he drunk driving laws of this State are . . . . regulatory and protective, designed to remove violat[or]s from the public highways as quickly as possible"); *Shell v. Bechtold,* 175 W.Va. 792, 796, 338 S.E.2d 393, 396 (1985); *Stalnaker v. Roberts,* 168 W.Va. 593, 599, 287 S.E.2d 166, 169 (1981).

The objective in an administrative revocation proceeding is the removal of "'substance-affected drivers from our roads in the interest of promoting safety and saving lives[.]'" *State ex rel. Hall v. Schlaegel*, 202 W. Va. 93, 97, 502 S.E.2d 190, 194 (1998) (quoting *Shell*, 175 W. Va. at 796, 338 S.E.2d at 396)). Thus,

12

"[w]here there is evidence reflecting that a driver was operating a motor vehicle upon a public street or highway, exhibited symptoms of intoxication, and had consumed alcoholic beverages, this is sufficient proof under a preponderance of the evidence standard to warrant the administrative revocation of his driver's license for driving under the influence of alcohol." Syl. Pt. 2, *Albrecht v. State,* 173 W.Va. 268, 314 S.E.2d 859 (1984).

Syl. Pt. 5, *Reed v. Hill*, 235 W. Va. 1, 770 S.E.2d 501 (2015). Furthermore,

[t]here are no provisions in either W.Va.Code, 17C-5-1, *et seq.,* or W.Va.Code, 17C-5A-1, *et seq.,* that require the administration of a chemical sobriety test in order to prove that a motorist was driving under the influence of alcohol, controlled substances or drugs for purposes of making an administrative revocation of his or her driver's license.

Syl. Pt. 4, *Coll v. Cline*, 202 W. Va. 559, 505 S.E.2d 662 (1998). *See also* Syl. Pt. 3, *White v. Miller*, 228 W. Va. 797, 724 S.E.2d 768 (2012) ("A driver's license to operate a motor vehicle in this State cannot be administratively revoked solely and exclusively on the results of the driver's horizontal gaze nystagmus test. Rather, additional evidence in conjunction with the horizontal gaze nystagmus test is required for revocation: for example, the results of other field sobriety tests; the results of a secondary chemical test; whether the vehicle was weaving on the highway; whether the driver admitted consuming an alcoholic beverage; whether the driver exhibited glassy eyes or slurred speech; and/or whether the odor of an alcoholic beverage was detected.").

At the heart of this appeal is whether an officer's failure to comply with the requirements of West Virginia Code § 17C-5-9 negates our well-established law concerning the necessary proof for revoking a driver's license in an administrative

proceeding thereby mandating an automatic reversal of the Commissioner's revocation order.

West Virginia Code § 17C-5-9 provides as follows:

> Any person lawfully arrested for driving a motor vehicle in this state while under the influence of alcohol, controlled substances or drugs shall have the right to demand that a sample or specimen of his or her blood or breath to determine the alcohol concentration of his or her blood be taken within two hours from and after the time of arrest and a sample or specimen of his or her blood or breath to determine the controlled substance or drug content of his or her blood, be taken within four hours from and after the time of arrest, and that a chemical test thereof be made. The analysis disclosed by such chemical test shall be made available to such arrested person forthwith upon demand.

*See* Syl. Pt. 1, *State v. York*, 175 W. Va. 740, 338 S.E.2d 219 (1985) ("W. Va. Code 17C-5-9 [1983] accords an individual arrested for driving under the influence of alcohol, controlled substances, or drugs a right to demand and receive a blood test within two hours of arrest."). Regarding this statute, we have held that

> [a] person who is arrested for driving under the influence who requests and is entitled to a blood test, pursuant to *W.Va.Code,* 17C-5-9 [1983], must be given the opportunity, with the assistance and if necessary the direction of the arresting law enforcement entity, to have a blood test that insofar as possible meets the evidentiary standards of 17C-5-6 [1981].[7]

---

[7] West Virginia Code § 17C-5-6 [2013] dictates how the blood test must be administered:

Continued . . .

14

Syl. Pt. 2, *In re Burks*, 206 W. Va. 429, 525 S.E.2d 310 (1999) (footnote added).[8]

Here, ignoring all other evidence that respondent was driving under the influence (including a SCT result of .159%), the lower tribunals concluded that Deputy Ellison's failure to satisfy the statute's requirements by refusing respondent's demand for a blood test warranted automatic reversal of the revocation based upon our decisions in *Hall*, which introduced the reversal remedy in administrative revocation cases, and *Divita*, which followed suit.

---

Only a doctor of medicine or osteopathy, or registered nurse, or trained medical technician at the place of his or her employment . . . may withdraw blood to determine the alcohol concentration in the blood, or the concentration in the blood of a controlled substance, drug, or any combination thereof. These limitations shall not apply to the taking of a breath test. In withdrawing blood to determine the alcohol concentration in the blood, or the presence in the blood of a controlled substance, drug, or any combination thereof, only a previously unused and sterile needle and sterile vessel may be utilized and the withdrawal shall otherwise be in strict accord with accepted medical practices. A nonalcoholic antiseptic shall be used for cleansing the skin prior to venapuncture.

*Id.*, in relevant part.

[8] The arresting officer's duty with respect to the results of a blood test under West Virginia Code § 17C-5-9 has been found to be as follows: "The requirement that a driver arrested for DUI must be given a blood test on request does not include a requirement that the arresting officer obtain and furnish the results of that requested blood test." *Burks*, 206 W. Va. at 430, 525 S.E.2d at 311, syl. pt. 3.

15

In *Hall*, officers stopped Mr. Hall's vehicle after observing it traveling the wrong way on a roadway. 235 W. Va. at 325, 773 S.E.2d at 669. According to testimony from one of the officers, Mr. Hall had difficulty locating his driver's license, appeared disoriented and confused, was unsteady walking to the roadside and while standing, and admitted to consuming alcoholic beverages. *See id.* Mr. Hall failed the horizontal gaze nystagmus test and refused to perform the walk-and-turn and one-leg-stand field sobriety tests. *See id.* He was arrested and transported to police department headquarters where he refused the secondary breath test and requested a blood test. Mr. Hall's blood was withdrawn and, although the blood sample was stored by law enforcement for testing by the West Virginia State Police Laboratory, testing was never conducted. *Id.* at 331, 773 S.E.2d at 675.[9] Mr. Hall's driver's license was revoked for both DUI and the refusal to submit to the designated chemical test. *See id.*

Upon the conclusion of the administrative hearing in *Hall*, the OAH determined that Mr. Hall was "effectively denied an independent blood test" by the officer's failure "'to cause [Mr. Hall's] blood specimens to be submitted . . . for [analysis of] their blood alcohol concentration[,]'" and that "the absence of the blood test 'denied [Mr. Hall] the right to obtain evidence for his defense' and constituted a denial of 'his due process rights.'" *Id.* at 326, 773 S.E.2d at 670. The OAH concluded that rescission of the

---

[9] Mr. Hall's blood sample was not tested because "during th[e] time [the sample was taken] the West Virginia State Police was not accepting blood, so it was not submitted. . . . No additional explanation for the failure to test the blood was provided." *Hall*, 235 W. Va. at 331, 773 S.E.2d at 675.

revocation order was "the only appropriate sanction[.]" *Id.*[10] The circuit court affirmed the OAH's ruling.

On appeal in *Hall*, we looked almost exclusively to our decision in *State v. York*,[11] a criminal DUI case, for "the evidentiary implications of a denial of a blood test," observing that,

> "[t]o deny th[e] right [to a blood test] would be to deny due process of law because such a denial would bar the accused from obtaining evidence necessary to his defense. . . . The defendant's right to request *and receive* a blood test is an important procedural right that goes directly to a court's truth-finding function."

*Hall*, 235 W. Va. at 332, 773 S.E.2d at 676 (quoting *York*, 175 W. Va. at 741, 338 S.E.2d 221).[12] Without further explanation in this regard, we affirmed the lower tribunals'

---

[10] The OAH in *Hall* also rescinded the revocation order to the extent it ordered revocation for Mr. Hall's refusal to submit to the secondary chemical test of the breath. *See id.* at 325, 773 S.E.2d at 669.

[11] 175 W. Va. 740, 338 S.E.2d 219.

[12] In addition to *York*, the Court in *Hall* made reference to a string of cases from Georgia that concluded that evidence of the driver's breathalyzer test results should be suppressed in the driver's *criminal* trial due to law enforcement's failure to accommodate the driver's request for an independent blood test, as required by the applicable statute then in effect. *See Koontz v. State*, 617 S.E.2d 207 (Ga. Ct. App. 2005); *Cole v. State*, 587 S.E.2d 314 (Ga. Ct. App. 2003); *State v. Button*, 426 S.E.2d 194 (Ga. Ct. App. 1992); *O'Dell v. State*, 409 S.E.2d 54 (Ga. Ct. App. 1991).

We note that in *York*, the defendant driver was stopped by law enforcement after his vehicle was observed weaving left of center and back for approximately 200 yards. *Id.* at 741, 338 S.E.2d at 220. The driver "reeked of liquor" and eventually submitted to a breathalyzer test, which recorded a blood alcohol content that was ".06 above the point at which one is legally presumed to be intoxicated." *Id.* The evidence was conflicting as to

Continued . . .

conclusions that "Mr. Hall was denied the statutory and due process rights, under West Virginia Code 17C-5-9, to have his blood tested independently" for purposes of an administrative revocation of a driver's license and affirmed the reversal of the order of revocation for DUI on that ground.[13]

Subsequently, in *Divita*, 2015 WL 5514209, a memorandum decision, we applied our holding in *Hall* and concluded that rescission of the Commissioner's revocation order was the appropriate remedy for the violation of the driver's due process rights where law enforcement officers failed to insure that the driver's blood sample was tested for controlled substances and, instead, directed that the sample be destroyed prior to the administrative hearing.[14]

---

whether the driver demanded a blood test. Ultimately, "[d]uring a hearing in chambers, the lower court found the evidence the [S]tate presented to be competent and believable, and accordingly made a factual determination that [the driver] did not demand a blood test." *Id.* at 221, 338 SE.2d at 742. On appeal, this Court upheld the ruling, finding "that the evidence supported the judge's finding." *Id.* Thus, importantly, we were not required to determine what consequences should flow from an officer's failure to satisfy the requirements of West Virginia Code § 17C-5-9 in the context of a criminal proceeding.

[13] *Id.* at 333, 773 S.E.2d at 677. With regard to the revocation for Mr. Hall's refusal to submit to the secondary chemical test, we reversed the circuit court's ruling and reinstated the one-year revocation of his driver's license on that ground. *See id.* at 330, 773 S.E.2d at 674.

[14] In *Divita*, law enforcement observed the driver's vehicle weaving, driving on the shoulder of the road, and almost striking a guardrail. *See id.* at *1 During the traffic stop, the driver's speech was slurred and, according to officers, "she seemed confused about the traffic stop." *Id.* The driver also performed two field sobriety tests and failed them both. *See id.* Finally, after observing in plain view a plastic baggie containing pills in the driver's purse, officers searched the purse and discovered 13 alprazolam pills and 15 oxycodone

Continued . . .

18

In the present appeal, we find compelling the Commissioner's argument that *Hall* and *Divita* were incorrectly decided and that both the OAH and the circuit court erred in reversing the revocation order in this case without considering the other evidence that respondent was driving while under the influence of alcohol, as our longstanding precedent relative to administrative revocations requires, or that, in denying respondent's requests for a blood test, Deputy Ellison acted under a misapprehension of the law and not in bad faith.

We observe that, in *Hall*, this Court embraced reasoning that is pertinent to an *accused's* right to due process in a criminal proceeding (i.e., to "obtain[] evidence necessary *to his defense*")[15] and blindly applied it to an administrative revocation of a driver's license. And, we did so without making even a passing reference to our long line of cases that have held that, under a preponderance of the evidence standard, evidence showing that the driver "exhibited symptoms of intoxication" and "had consumed alcoholic beverages" is sufficient to warrant the administrative revocation of his or her driver's

---

pills. *See id.* Upon her arrest, at both the request of the driver and the officer, the driver's blood was drawn and tested for alcohol, producing a negative result. The blood sample was not, however, tested for controlled substances and, because the West Virginia State Police Lab had temporarily lost accreditation to do forensic blood testing, the blood sample was destroyed at the conclusion of the criminal case but before the administrative hearing. *See id.* Although the OAH concluded that, "in spite of the lack of blood [test] results, there was sufficient evidence to show that [the driver] was driving under the influence of controlled substances, finding 'the question is not about the blood test[,]'" the circuit court reversed on the ground that the officer's failure to ensure that the blood sample was tested for controlled substances or preserved for further testing violated the driver's right to due process. *Id.* at *2. Based upon *Hall* and *York*, this Court affirmed.

[15] *See York*, 175 W. Va. at 741, 338 S.E.2d 221 (describing due process rights of "the accused" and "the defendant" under West Virginia Code § 17C-5-9).

19

license for DUI.[16] In other words, *Hall* did not acknowledge that the evidence showing that Mr. Hall was observed driving the wrong way, failed a field sobriety test, appeared disoriented and confused, was unsteady on his feet, and admitted to consuming alcoholic beverages, may have been sufficiently proven at the administrative proceeding so as to uphold the administrative revocation of his driving privileges for DUI.[17] We now believe that, in *Hall* and, later, in *Divita*, we imprudently concluded that law enforcement's failure to follow West Virginia Code § 17C-5-9 when a driver demands a blood test is, per se, a violation of due process in the context of the administrative revocation of a driver's license, automatically requiring a rescission of the revocation order without consideration of the entire record.[18]

We have held that "[a] driver's license is a property interest and such interest is entitled to protection under the Due Process Clause of the West Virginia Constitution." Syl. Pt. 1, *Abshire v. Cline*, 193 W. Va. 180, 455 S.E.2d 549 (1995). West Virginia

---

[16] *See e.g., Dale v. Ciccone*, 233 W. Va. 652, 760 S.E.2d 466 (2014); *Groves v. Cicchirillo*, 225 W. Va. 474, 694 S.E.2d 639 (2010); *Lowe v. Chicchirillo*, 223 W. Va. 175, 672 S.E.2d 311 (2008); *Coll v. Cline*, 202 W. Va. 599, 505 S.E.2d 662 (1998); *Albrecht*, 173 W. Va. 269, 314 S.E.2d 861.

[17] We have said that the matter of credibility of witnesses and evidence, which play an important role in factual determinations, is "'reserved exclusively for the trier of fact.'" *Frazier v. S.P.*, 242 W. Va. 657, 664, 838 S.E.2d 741, 748 (2020) (quoting *Martin v. Randolph Cty. Bd. of Educ.*, 195 W. Va. 297, 304, 465 S.E.2d 399, 406 (1995)).

[18] We note that, in *Hall*, the Court elected not to create an "[o]riginal syllabus point[]" to announce an important new point of law decided in the case." *State v. McKinley*, 234 W. Va. 143, 149, 764 S.E.2d 303, 309 (2014). And, we believe, correctly so.

Constitution Article III, section 10 provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of their peers." Though due process has been described as an "'inherently elusive concept,'" this Court has nonetheless characterized the right of due process as one of fundamental fairness: "[D]ue process . . . is ultimately measured by the concept of fundamental fairness." *In re Brandi B.*, 231 W. Va. 71, 80, 743 S.E.2d 882, 891 (2013) (quoting *State ex rel. Blankenship v. Richardson,* 196 W. Va. 726, 739, 474 S.E.2d 906, 919 (1996); *see also State ex rel. Peck v. Goshorn,* 162 W. Va. 420, 422, 249 S.E.2d 765, 766 (1978) ("[D]ue process of law is synonymous with fundamental fairness."). We have also said that "due process in the civil context 'is a flexible concept which requires courts to balance competing interests in determining the protections to be accorded one facing a deprivation of rights.' *Clarke v. W. Va. Bd. of Regents*, 166 W. Va. 702, 710, 279 S.E.2d 169, 175 (1981)." *In re J.S.*, 233 W. Va. 394, 402, 758 S.E.2d 747, 756 (2014). *See also* Syl. Pt. 2, in part, *North v. West Va. Bd. of Regents*, 160 W. Va. 248, 233 S.E2d 411 (1977) ("Applicable standards for . . . due process, outside the criminal area, may depend upon the particular circumstances of a given case.").

In determining whether the revocation of respondent's driver's license for DUI was fundamentally unfair given respondent's request for a blood test and Deputy Ellison's failure to give him the opportunity to have a blood test, we find our decision in

21

*State v. Osakalumi*[19] to be instructive. In that case, the defendant was tried and convicted of first-degree murder for the shooting death of a victim whom defendant claimed died from a self-inflicted gunshot during a game of Russian Roulette. 194 W. Va. at 506, 194 S.E.2d at 760. Many months after the victim's death, law enforcement discovered a bloodied couch in the home where the shooting occurred that had a bullet hole from which they extracted a badly deformed bullet, hair, and bone fragments. *See id.* Through a tear in a couch cushion, a detective inserted a writing pen into the bullet hole to determine the trajectory of the bullet. Officers eventually seized the couch and stored it at the police department. *See id.* However, in addition to emitting an unpleasant odor, the couch was determined to be both a fire and health hazard, and so, with the consent of the prosecuting attorney's office, officers disposed of the couch at a local landfill. *See id.* Prior to disposing of it, however, officers failed to take measurements of the couch, record or photograph the location of the bullet hole on the couch, or photograph the trajectory of the bullet. *See id.*

At the trial in *Osakalumi*, the trajectory of the bullet was a critical question as to whether the manner of death was homicide or suicide. The defendant's firearms examiner and forensic scientist testified that the trajectory of the bullet could not be accurately determined from a couch that had been sat, slept, and played upon during the seven months since the victim's death. 194 W. Va. 762, 461 S.E.2d at 508. According to the defendant's expert, the bullet found in the couch could have moved from where it was

---

[19] 194 W. Va. 758, 461 S.E.2d 504 (1995).

22

originally lodged before the couch was finally examined by the police. *See id.* In contrast, the State medical examiner, who never personally examined the couch, testified that the detective had presented him with a diagram of the couch depicting the trajectory of the bullet. However, the detective's diagram had been made from memory after the couch had already been destroyed. 194 W. Va. at 761, 461 S.E.2d at 507. It was then revealed at trial that the diagram had been lost and so the medical examiner was permitted to draw the detective's couch diagram from his own memory and testify that, based upon his examination of the victim's skull and the trajectory of the bullet through the couch, the manner of the victim's death was homicide.[20] *See id.* The defendant was convicted of first-degree murder.

The defendant appealed his murder conviction to this Court on the ground that his due process rights were violated when the trial court permitted the State to introduce evidence from the couch, which was destroyed without the defendant ever having the opportunity to examine it, because the evidence relating to the purported trajectory of the bullet through the couch was crucial to the medical examiner's determination that the victim's manner of death was homicide rather than suicide. *See id.* at 762, 461 S.E.2d at 508.

---

[20] Specifically, the medical examiner concluded that the victim "was held down on the couch and was shot through the head, with the bullet travelling in a straight line." *Id.* at 761, 461 S.E.2d at 507 (footnote omitted).

23

On appeal in *Osakalumi*, we recognized that, "[a]s a matter of state constitutional law . . . fundamental fairness requires this Court to evaluate the State's failure to preserve potentially exculpatory evidence in the context of the entire record." *Id.* at 766, 461 S.E.2d at 512. To that end, we established the following paradigm relative to a state's failure to preserve evidence that is requested by a criminal defendant:

> "When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either *West Virginia Rule of Criminal Procedure* 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction."

*Id.* at 759, 461 S.E.2d at 505, syl. pt. 2. Applying this analysis to the facts of *Osakalumi*, we concluded that the defendant's trial "was so fundamentally unfair as a result of the admission of evidence regarding the destroyed couch"[21] that we reversed his conviction and remanded the case for a new trial. *Id.* at 768, 461 S.E.2d at 514.

---

[21] In *Osakalumi*, a jury instruction was given that reiterated that the couch was destroyed by police before the defendant could examine it, and admonished the jury that it

Continued . . .

24

We find this analysis to be instructive for proceedings involving the revocation of a driver's license for DUI where a driver demands a blood test pursuant to West Virginia Code § 17C-5-9, but the test is never given, a chemical analysis of the blood that is withdrawn is never completed, or the blood test results are lost. In such a case, the trier of fact must consider (1) the degree of negligence or bad faith involved in the violation of the statute; (2) the importance of the blood test evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the proceeding to sustain the revocation. The trier of fact must consider these factors in determining what consequences should flow from the absence of the blood test evidence under the particular facts of the case. [22] For purposes of appellate review, it is imperative that the trier of fact make specific findings

---

"should scrutinize [the evidence from the couch] with great care and caution[,]" and that "[t]his destruction of the couch may very well have deprived the defendant of evidence crucial to his defense and which may in fact have exculpated him." *Id.* at 768, 461 S.E.2d at 514. We concluded that "this instruction, under the circumstances of this case, was not sufficient to protect [the defendant's] right of due process" and that the appropriate remedy was to award a new trial. *Id.*

[22] Based upon SCT results showing that he had a BAC of .159%, respondent's driver's license was revoked for operating a vehicle for DUI while having a BAC of ".15 or higher," *see* W. Va. Code § 17C-5A-2(k)(1), or "aggravated DUI." *See* W. Va. Code § 17C-5-2(f). On remand, the OAH may draw an adverse inference from the absence of blood test evidence because such evidence may have rebutted the particular SCT results in this case. While the OAH may draw such an inference, it must also consider all of the other evidence presented to determine whether respondent was operating a motor vehicle while having a BAC of .15 or higher, and recognizing that, with such inference, the evidence may show that respondent drove a vehicle "while he or she is in an impaired state," *see* W. Va. Code § 17C-5-2(e), what petitioner refers to as "simple DUI," rather than "aggravated DUI."

25

relative to these factors in its decision. We find such an analysis to be in keeping with our long-held precedent that an administrative revocation of a driver's license for DUI is warranted "[w]here there is evidence reflecting that a driver was operating a motor vehicle upon a public street or highway, exhibited symptoms of intoxication, and had consumed alcoholic beverages[.]" *Hill*, 235 W. Va. at 1, 770 S.E.2d at 501, syl. pt. 5, in part.

Because we conclude that it was error for the circuit court to affirm the rescission of the revocation order, we reverse the court's order and remand this matter directly to the OAH for a new hearing that is to be conducted consistent with this opinion.[23]

---

[23] We observe that, in 2020, the Legislature, among other changes, amended the procedure for driver's license revocation for DUI. *See generally* W. Va. Code § 17C-5-2 [2020]. Additionally, with regard to appeals of revocation orders, we note that the OAH "shall be terminated" on July 1, 2021, W. Va. Code § 17C-5C-1a(d) [2020], and that, in certain cases, revocation or suspension orders that are pending before the OAH on or after that date "shall be dismissed." W. Va. Code § 17C-5C-1a(c)(1). In other cases, however, the appeal "shall be transferred to the circuit court" "for the circuit in which the event giving rise to the contested decision of the Commissioner . . . occurred." W. Va. Code § 17C-5C-1a(c)(2); W. Va. Code § 17C-5C-1a(b). "For any appeal transferred . . . the circuit court shall adopt any existing records of evidence and proceedings in the [OAH], conduct further proceedings as it considers necessary, and issue a final decision or otherwise dispose of the case . . . ." W. Va. Code § 17C-5C-1a(c)(2). The parties herein do not address the impact of West Virginia Code § 17C-5C-1a on respondent's case [i.e., whether respondent's revocation "shall be dismissed" or the appeal "shall be transferred to the circuit court"], an issue that must be determined upon remand. To expedite this determination, we issue the mandate of the Court contemporaneously with the issuance of this opinion.

## IV. Conclusion

For the foregoing reasons, we reverse the Circuit Court of Kanawha County's order entered on January 21, 2020, and remand this case to the OAH for further proceedings consistent with this opinion. The mandate of the Court shall issue forthwith.

Reversed and remanded, with directions.